# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 21-641

**STATE OF LOUISIANA**

**VERSUS**

**MARSHALL J. ALEXANDER, JR.**

\*\*\*\*\*\*\*\*\*\*

**APPEAL FROM THE**
**SIXTEENTH JUDICIAL DISTRICT COURT**
**PARISH OF ST. MARTIN, NUMBER 14-247176**
**HONORABLE GREGORY P. AUCOIN, DISTRICT JUDGE**

\*\*\*\*\*\*\*\*\*\*

**SHARON DARVILLE WILSON**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Sharon Darville Wilson, and Charles G. Fitzgerald, Judges.

**CONVICTION REVERSED AND**
**SENTENCE VACATED.**

**Pickett, J., dissents and assigns written reasons.**

**Edward K. Bauman**
**Post Office Box 1641**
**Lake Charles, Louisiana  70602**
**(337) 491-0570**
**Counsel for Defendant/Appellant:**
     **Marshall J. Alexander, Jr.**

**M. Bofill Duhé, District Attorney**
**Renee Louviere, Assistant District Attorney**
**W. Claire Howington, Assistant District Attorney**
**Louisiana Sixteenth Judicial District Attorney's Office**
**300 Iberia Street, Suite 200**
**New Iberia, Louisiana  70560**
**(337) 369-4420**
**Counsel for Appellee:**
     **State of Louisiana**

**WILSON, Judge.**

Defendant, Marshall James Alexander, Jr., appeals his conviction on the charge of second degree murder, a violation of La.R.S. 14:30.1. For the reasons that follow, we reverse the conviction and vacate the sentence.

## I.

## ISSUES

We must decide:

1. Whether the evidence was sufficient to support Defendant's conviction; and

2. Whether the trial court abused its discretion when it denied Defendant's motion in limine to exclude evidence of gunshot primer residue (GSR) testing.

## II.

## FACTS AND PROCEDURAL HISTORY

Scott Paul Latiolais was fatally shot on March 29, 2002, and his body was found in St. Martin Parish in a grassy field that had been the parking lot of Las's restaurant, which was near the intersection of Henderson Highway and Old Henderson Highway. An autopsy revealed that there was a gunshot wound to Latiolais' back and that he lost about half of his blood volume. There were more than 200 pellets in his body, and the doctor who performed the autopsy opined that the weapon used was possibly a .12 gauge. Dr. Christopher Tape, an expert in forensic pathology, reviewed the autopsy and concluded that, as a result of his injuries, Latiolais died within "ten minutes plus or minus" of being shot. The autopsy findings were consistent with death between 12:00 and 3:00 a.m.

Defendant was charged by indictment filed on June 26, 2014, with second degree murder, a violation of La.R.S. 14:30.1. The indictment was later amended to delete language indicating that Defendant knowingly and intentionally

committed the offense.[1] The matter proceeded to trial by jury. The jury returned a verdict of guilty on December 13, 2019. Defendant timely filed motions for post-verdict judgment of acquittal and for new trial, but those motions were denied. On July 7, 2020, Defendant was sentenced to life imprisonment at hard labor without benefits. This appeal followed.

## III.

## LAW AND DISCUSSION

### ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there are no errors patent.

### SUFFICIENCY OF THE EVIDENCE

In his first assignment of error, Defendant contends that the eyewitness testimony established that Timothy Roberts shot Latiolais, that GSR testing was inconclusive and speculative, and that no testimony established that Defendant knew Roberts was trying to rob Latiolais before Roberts shot Latiolais. Defendant argues that given such evidence, the State failed to exclude the reasonable hypotheses that Defendant did not shoot Latiolais and that Defendant did not know that Roberts intended to rob Latiolais before Roberts shot him.

The State attempted to prove that Defendant committed second degree murder in that he had the specific intent to kill Latiolais or that he was a principal to second degree murder committed by Roberts during the commission of an armed robbery.

---

[1]This occurred as a result of the trial court granting a motion to quash, which addressed the form of the indictment, during voir dire of Defendant's first trial. This court subsequently granted the State's writ application and vacated the trial court's ruling. *State v. Alexander*, 17-511 (La.App. 3 Cir. 9/8/17) (unpublished opinion).

2

The constitutional standard for evaluating the sufficiency of the evidence is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find that the State proved all the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). When circumstantial evidence is introduced to prove the commission of a crime, La.Rev.Stat. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." Under *Jackson v. Virginia*, all evidence, both direct and circumstantial, must be sufficient to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. *State v. Ortiz*, 96–1609, p. 12 (La. 10/21/97), 701 So.2d 922, 930.

*State v. Bright*, 98-398, p. 11 (La. 4/11/00), 776 So.2d 1134, 1141. "[I]n the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion." *State v. Higgins*, 03-1980, p. 6 (La. 4/1/05), 898 So.2d 1219, 1226, *cert. denied*, 546 U.S. 883, 126 S.Ct. 182 (2005).

When a key issue at trial is whether the defendant was the perpetrator of the crime, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof beyond a reasonable doubt. *State v. Smith*, 430 So.2d at 45; *see also State v. Brady*, 414 So.2d 364, 365 (La.1982); *State v. Long*, 408 So.2d 1221, 1227 (La.1982). The fact-finder weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations. *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983). However, we are mindful that the touchstone of *Jackson v. Virginia* is rationality and that "irrational decisions to convict will be overturned, rational decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law." *State v. Mussall*, 523 So.2d at 1310.

*Bright*, 776 So.2d at 1147.

Second degree murder is the killing of a human being "[w]hen the offender has a specific intent to kill" or "[w]hen the offender is engaged in the perpetration or attempted perpetration of . . . armed robbery . . . even though he has no intent to kill or to inflict great bodily harm." La.R.S. 14:30.1(A). "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender

actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). "Specific intent may be inferred from circumstances surrounding the offense and the conduct of the defendant." *State v. Hoffman*, 98-3118, p. 48 (La. 4/11/00), 768 So.2d 542, 585, *supplemented by*, 00-1609 (La. 6/14/00), 768 So.2d 592, *cert. denied*, 531 U.S. 946, 121 S.Ct. 345 (2000) (citations omitted).

Under felony-murder, the State must prove the commission of the underlying felony or attempted felony. The pertinent question is whether Defendant was a principal to armed robbery or attempted armed robbery, and if so, whether Latiolais was killed during the commission of that armed robbery or attempted armed robbery. Louisiana Revised Statutes 14:24 defines a principal as: "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals."

> Only those persons who knowingly participate in the planning or execution of a crime are principals to that crime. An individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state, and the mental state of one defendant may not be imputed to another defendant. Thus, mere presence at the scene of a crime does not make one a principal to the crime. However, it is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice's intention. *State v. Page*, 08–531 (La.App. 5 Cir. 11/10/09), 28 So.3d 442, 449, *writ denied*, 09–2684 (La. 6/4/10), 38 So.3d 299.

*State v. Petty*, 12-278, p. 11 (La.App. 5 Cir. 10/30/12), 103 So.3d 616, 623.

> A person who is a principal in an armed or an attempted armed robbery is criminally responsible for any killing which results from its perpetration or attempted perpetration. See *State v. Johnson*, 365 So.2d 1267 (La.1978).

*State v. Wiggins*, 465 So.2d 271, 273 (La.App. 3 Cir. 1985).

4

Armed robbery is defined in La.R.S. 14:64(A) as follows: "Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." Louisiana Revised Statutes 14:27 provides:

> A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
>
> B. (1) Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.

"The mere fact nothing was taken from the victim during a robbery does not prevent a second degree murder conviction." *State v. Hensley*, 00-1448, p. 5 (La.App. 5 Cir. 2/28/01), 781 So.2d 834, 840.

Katherine Landry lived in Henderson in 2002 when Latiolais was killed. At the time, she lived near Las's, which was vacant. The adjacent parking lot had a lot of foot traffic. At 2:43 a.m. on the day in question, Landry was roused by her dogs' constant barking. Sometime around 5:00 a.m., the dogs woke her again, and she let one of them out and discovered a body thirty to forty feet from her trailer. According to Landry, the victim lived in the area.

Marcus Guidry was employed by the St. Martin Parish Sheriff's Office in 2002. He arrived on scene at approximately 6:30 a.m. Officer Guidry approached the victim, who was deceased, and saw what appeared to be a gunshot wound to his back. Officer Guidry immediately recognized the victim as Latiolais, who lived across the highway from where he was found. The coroner subsequently removed a wallet from the victim's body and confirmed the identification.

As part of the investigation, Officer Guidry was assigned to canvass the neighborhood for witnesses. It was determined that Defendant and Roberts were persons of interest. Officer Guidry subsequently observed Defendant and Roberts walking together near the crime scene and approached them. The two were taken to the St. Martin Parish Sheriff's Office in St. Martinville and interviewed. Defendant executed a waiver of rights. Officer Guidry testified that the statements of Defendant and Roberts were vague. They both provided an alibi and indicated that they never saw Latiolais or Tony Mouton. However, while being driven home, Roberts mentioned last seeing Latiolais with Mouton.

Officer Guidry testified about the events that occurred prior to Latiolais' death:

> We learned that that Thursday [Defendant] had custody of his kids that evening and he needed to bring them back to the mother, Miss Vital. . . . Learned that he was with Timothy and Joseph.[2] The children were brought back and they returned to Henderson to [Defendant's] home and stayed there a few minutes and after, I think, they ended up at Timothy's home and then stayed there several minutes and then they ended up at one of their friends [sic] house, a Julius Charles. And they stayed there and they were drinking and said all three of them, Julius, Timothy and [Defendant] had smoked a blunt, which is a marijuana or cigar with marijuana in it. And it was, I don't know, fifteen (15), twenty (20) minutes they stayed and they were looking for crawfish. And learned that they left, Timothy and [Defendant] left and went to International Seafood, which is right behind Julius Charles on the Old Henderson Highway. And there's a path that's commonly used by the residence [sic] to get from Old Henderson to the main highway, 352, which it wasn't a public access, but when the restaurant was open years ago, it was Las's, they used it to travel back and forth. It wasn't an improved or paved roadway, but it was a path commonly walked and I think occasionally vehicles would travel it, but that was a route that we learned that they took to International Seafood. They were in the process of looking for crawfish because, I think this was Good Friday, looking for crawfish for the Easter weekend and they met up with one of the employees there by the name of Ted and tried to get some crawfish and they couldn't get any. And we had learned in a conversation with Tony that Scotty Latiolais was sitting with Tony at his home, which is located right across from the seafood plant and they were talking and knowing

---

[2]The witness did not indicate who Joseph was.

the history of Scotty Latiolais I knew that he had I would say a dependency, a drug dependency and he asked Tony, he was looking for some crack cocaine. In the conversation with Tony he said he was [sic] accommodate him with that and went across the street to the International Seafood and indicated he had a conversation with Timothy Roberts. And he said [Defendant] and Timothy were there. Timothy told him he didn't have anything, he could provide him, give him ten or fifteen (15) minutes he'll try to find something. He remembered seeing Timothy on the cell phone engaging [sic] conversation with someone, he don't know who. And I think from there Tony said he went back -- left Scott sitting in his yard. There was a bench in Tony's yard, Scotty was sitting there, went back and told him he, you know, they couldn't find anything. And they sat there in discussion for several minutes and he observed -- Tony said in this conversation I had with him he said he observed [Defendant] and Timothy go into the house next to the plant, I guess it's Timothy's house. He was able to describe their clothing.

Officer Guidry confirmed that Roberts' mother lived right next to International Seafood, which was near Mouton's home. Charles' residence was right off the highway next to Las's. According to Officer Guidry, Mouton would have a direct view of International Seafood and the Roberts' residence from his home.

Officer Guidry spoke to Mouton at his place of employment. Mouton informed Officer Guidry that he saw Defendant and Roberts wearing white shirts and that one of them wore jeans and the other dark pants. According to Mouton, he observed them enter Roberts' home and exit wearing dark colored clothing. He stated that both had hoods on. Both walked past Mouton in the alley going toward Las's. Mouton also reported that Latiolais was looking for crack and that Mouton was negotiating with Roberts to procure the crack. After speaking to Mouton, police spoke to Defendant and Roberts again. Roberts provided a written statement.

Mouton testified that he lived with his mother on Old Henderson Highway across the street from the seafood processing plant in 2002. Defendant and Roberts lived in separate trailers on Joseph Roberts' property, which was next to

the seafood plant. Mouton had known Defendant and Roberts almost all of their lives. Mouton also knew Latiolais because he had worked for Latiolais' mother. Latiolais lived off Henderson Highway, "behind the house on the next street." Mouton's house was within walking distance, and Latiolais would pass Las's when walking to Mouton's home.

Mouton saw Latiolais on Thursday, the day before Good Friday. They sat under a tree in Mouton's yard. Mouton was a drug user then, and Latiolais was looking for drugs. Mouton crossed the street and spoke to Defendant and Roberts about drugs for Latiolais and was told that they would get back to him in a few minutes. Mouton testified that he did not remember how much money Latiolais had to buy drugs.

Mouton further testified as follows:

Q.  Okay. And then what happened next after you said you saw them, they were on the street.

A.  Uh-huh. So that's when Scott told him, he said, well, I'm going to go home. But before he said that they already had passed us up.

. . . .

A.  And so Scott said, I'll see you later. I said, okay. So he left and then that was the last I seen [sic] him.

While Defendant and Roberts were on the street going toward Las's and Mouton and Latiolais were still sitting under the tree, Mouton hollered at Defendant and Roberts. They did not respond. Mouton testified that one of them wore a dark hood. He could not remember how the other was dressed. Mouton testified that prior to that, both Defendant and Roberts went into "their" house and returned outside. When asked if he remembered if they were wearing the same clothes as when he approached them, Mouton replied "Uh-huh, yes, ma'am." His

8

memory was refreshed with the statement he gave to police. Mouton was further questioned about the clothing that Defendant and Roberts wore:

Q.    What -- how did you describe them way back in 2002 that they were dressed?

A.    I told you one was in black with a black hoodie.

. . . .

A.    Yeah. And dark pants.

. . . .

A.    The jacket wasn't button down or anything, that's how I could tell.

Q.    Okay. And the other one -- so you said one had a jacket.

A.    Uh-huh.

Q.    And one didn't.

A.    Uh-huh.

Q.    Okay. And you were able to see both of their while [sic] t-shirts as you told the police?

A.    Yes, ma'am.

Q.    Okay. And then, and then the next time you saw them after they left their house they weren't dressed the same.

A.    No.

Q.    Okay. And what was the difference?

A.    The only thing one had the hoodie and before he didn't have it on.

Q.    Okay. And could you see their shirts a second time?

A.    Uh-uh, no, ma'am.

Mouton was questioned on cross-examination as follows:

Q.    All right. Now you told the police they were both wearing dark jackets, right?

A.    Uh-huh.

9

Q.    And both of them had hoods on.

A.    Uh-huh.

Q.    They both had hoods on, right?

A.    One of them had it.

Q.    Well, now you said they both had hoods.

A.    Okay, right. Well, I made a mistake then.

Q.    Okay. And you gave this statement the same day that Scott has passed away. All right. And so you told them both these guys were wearing hoods.

A.    Okay.

Q.    And you told them both these guys were wearing hoods just a few minutes before you heard that shot, right?

A.    Yes, sir.

Q.    Okay. Okay. Everything you told the police that day that's what you remember and that's what you understood, right?

A.    Yes, sir.

When asked, "Do you recall if it was cold outside?" Mouton responded, "Uh-uh. No."

Mouton stated that Latiolais left Mouton's home around 10:30 or 11:00 p.m. He heard gunshots or noise three or four minutes later. Mouton clarified that he heard one noise when he was going into his house. He looked on the side of his house and saw two guys running toward his neighborhood to the Roberts property. He did not know who they were. When asked if he told police he knew who they were, he said, "Uh-uh." Mouton then testified that he did not recall providing names to police and denied doing so. Mouton was presented with the statement he gave police on March 29, 2002. He was asked, "And in that recorded statement it indicates that you referred to Marshall Alexander and Timothy Roberts as being the two individuals that were running down the street." Mouton responded, "Yes,

10

ma'am." He acknowledged that the individuals he saw were dressed the same as the two people that went down the street earlier. He was then asked, "those two individuals were, in fact, Timothy Roberts and Marshall Alexander." He replied, "Yes, ma'am." Mouton stated that he did not know who killed Latiolais.

Mouton did not recall telling police "the guys" knew Latiolais had money on him. When he was presented with his statement, he stated: "I remember now."

A transcript of Mouton's statement to police was introduced as State's Exhibit 6 and was published to the jury. In that statement, Mouton reported that Roberts and Defendant passed by and were dressed in black with hoods and that he called out to them. He further reported that the two were walking very close together with their hands in their pockets. According to Mouton, Latiolais stayed with Mouton for ten to fifteen minutes after the two passed. He heard that Roberts had gotten a gun but did not know what kind. He had never known Defendant to be violent or have a gun. Mouton was questioned about the clothing and stated that Defendant and Roberts were wearing "all dark clothing [] before the incident[.]" He stated that Defendant had a black hooded jacket but was not wearing the hood. Mouton said that after the incident, Defendant and Roberts passed him and both were wearing the hoods and Mouton wondered "it's not cold out here, why they got [sic] that on their heads." When the two were running back, Mouton thought that Roberts was in front of Defendant, but he was not sure.

Officer Sammy Inzerella responded to the crime scene and searched for physical evidence. Officer Inzerella testified that castings of shoe prints were made. He further indicated that police searched the field where Latiolais was found, ponds behind the seafood processing plant, and ditches. No evidence was recovered from the ponds. He retrieved firearms evidence which consisted of

11

"shot shell debris" from the field. The shell debris was submitted to the Acadiana Crime Lab (ACL) in 2002.

Officer Inzerella transported evidence to ACL. Additionally, on October 18, 2011, he retrieved sealed boxes marked "'A'" and "'B'" from Assistant District Attorney Chester Cedars. ADA Cedars reported that the boxes contained loose items of evidence, and Officer Inzerella returned the boxes to the evidence custodian without opening them. It was customary for ADA Cedars to have evidence for trial. ADA Cedars kept evidence in a safe in his office; however, Officer Inzerella did not know where the evidence at issue had been kept.

Evans Williams, Jr., a former employee of the St. Martin Parish Sheriff's Office, reported to the parking lot at Las's in 2002. He was the lead detective on the case. Detective Williams spoke to Hebert Gournet who indicated that he heard a sound like a shotgun blast close to his house just before the news went off. Detective Williams subsequently attempted to speak to Mouton, who did not want to talk around others. Mouton later told Detective Williams that Defendant and Roberts had passed in front of his residence while he was sitting outside. Detective Williams shared this information with Officer Guidry, and the two subsequently saw Defendant and Roberts at the scene. Detective Williams and Officer Guidry approached Defendant and Roberts, who accompanied the officers to the police station. Both suspects gave statements, which were inconsistent with the information obtained by police. Detective Williams also spoke to Charles because his name kept popping up.

Detective Williams spoke to Mouton again after he had met with Defendant and Roberts. Mouton reported that Defendant and Roberts wore clothing that did not "suit the type of weather it was for that particular night," including long sleeves and "a hoodie or something to that effect." Mouton also stated that they were

12

wearing dark clothing and proceeded toward Las's parking lot. Mouton further indicated that the two were walking really close to each other and that he knew something was not right.

Based on Mouton's information, Detective Williams obtained permission to search the homes of both Defendant and Roberts. The form giving permission to search Roberts' residence was signed at 11:01 a.m. on March 29, 2002. Police searched Roberts' residence first and found clothing and tennis shoes that matched "some of the description that was given . . . by [] Mouton." Police collected a pair of pants from Roberts, which was marked as Exhibit 24. A shirt was marked as State's Exhibit 25. Detective Williams also identified the following exhibits: (1) State's Exhibit 26, which was a pair of pants that was collected from Roberts' residence on March 29, 2002; and (2) State's Exhibit 27, which was a gray sweatshirt. "[A] .12 gauge, a .20 gauge shotgun" and a box of shotgun shells was found at the residence of Roberts' father. Police collected a shotgun from Yancy Guidry.

The form giving permission to search Defendant's residence did not set forth a time. On March 29, 2002, Detective Williams collected assorted items from Defendant's residence, including: 1) State's Exhibit 19, which was a blue Nike jacket and a pair of slippers; 2) State's Exhibit 20, described as a jacket; 3) a t-shirt and sweatpants marked as State's Exhibit 21; 4) a gray sweater marked as State's Exhibit 22; and 5) State's Exhibit 23, which was a pair of pants. Police also seized a pair of tennis shoes, which were not introduced into evidence. Various items were turned over to ACL.

Detective Williams addressed bagging collected evidence together as follows:

> If there was either a pair of tennis shoes or something with the clothing at the time we normally would bag that also too because this is not considered contamination at all because you have people already that put the evidence where you looking for it and it's already together.

According to Detective Williams, items on opposite sides of the room would be bagged separately. If socks were inside of shoes, they would be bagged together. Detective Williams thought it was important that all items that were collected together, like the jacket and slippers, be tested.

State's Exhibit 19, a blue Nike jacket, did not have a hood. Police also obtained permission to take DNA samples, including hair, blood, and saliva, from Defendant and Roberts. Those samples were turned over to ACL.

Detective Williams testified that Latiolais' employer stated that Latiolais was paid a little over $200.00. There was no testimony regarding when Latiolais was paid. Latiolais' wallet and five twenty dollar bills and a brown container with $60.49, for a total of $160.49, were returned to his family. Detective Williams testified that the first grand jury that was convened indicted Roberts for first degree murder.

August Dupuis, also a former employee of the St. Martin Parish Sheriff's Office, testified at trial. He identified an aerial map of the area. He noted that the ponds in the area were searched until the highway department objected.[3] He also acknowledged that police were not present at the ponds twenty-four hours a day, seven days a week. Officer Dupuis was questioned about the chain of custody and the evidence custodian's lack of knowledge as to where the evidence was at all times.

---

[3] Detective Williams testified that ponds by Seafood International were searched approximately three weeks after the victim was killed.

Charles testified that Defendant and Roberts were his cousins. In 2002, Charles lived on property that backed up to that of Mouton. Roberts' property was catty-corner to his, and there were two yards before you got to Las's. Charles knew Latiolais and acknowledged that Latiolais used crack cocaine. He noted that Latiolais could walk home through the field by Las's.

Charles testified that on March 28, 2002, Defendant, Roberts, and Reginald Lewis went to Charles' home after Charles got off work. They stayed there until 9:30 or 10:00 p.m., and Defendant and Roberts left together. Charles reported that his father did not like people walking through the yard, so Defendant and Roberts had to go around Las's and through the field.

Roberts subsequently called Charles, and Charles met him in Las's parking lot before midnight. The two met close to Charles' cousin Tommy's house, which was located right behind "that pond." Charles testified he was never told why Roberts wanted to meet. Charles, Roberts, Defendant, and Latiolais were present in the field. As Charles approached, Roberts was talking to Latiolais, and Defendant was "on the side chilling." Charles spoke with Defendant and did not hear what Roberts and Latiolais were saying. Charles left to go home. He was about to turn in front of Las's when he heard someone running in the rocks toward the road, which was in his direction. He turned and heard a gunshot. He saw Roberts and Latiolais running; heard a blast, which came out of Roberts' hand; and saw a flash. Charles then took off running. He did not see Defendant, who had been "on the side." He recalled that Roberts was wearing a hoodie but said that Defendant was not. Roberts subsequently called Charles and told him not to say anything. Charles did not call Defendant.

Charles testified that he was picked up at his work place by police. He admitted that his first statement to police was not consistent with his testimony.

15

He told police that he went to a hotel for the weekend and did not know anything. He gave a second statement, which was different. Charles testified that in every statement he said Roberts did it and that his testimony to that was not going to change.

> Charles discussed a statement he gave to the State Police as follows:

> I told her I didn't see the face of the person, but she tried to make it seem like it wasn't who I said it was but that's not the case.

> . . . .

> . . . she asked me if I seen [sic] the face, but I knew it was him. He my [sic] friend. We grew up together. I know who it is running right there. I'm not retarded. It don't [sic] take a rocket scientist to see that one of my pardon [sic], Marshall taller [sic] than both of us, I knew who he was.

> . . . .

> . . . I can name the people that done [sic] gave me statements. You probably don't even have them all, I'm pretty sure, but do I trust that person and tell them what I'm really supposed to tell them. Or do I tell then under oath. Which one do you think?

> . . . .

> . . . But I'm not under oath when they ask me.

> . . . .

> . . . I could tell them whatever I want. I'm not under oath.

> . . . .

> . . . But the truth didn't change. They gonna [sic] tell you. For seventeen (17) years I been questioned by overt thirty (30) people. You know, I don't know if it's y'all, I don't know if it's for them, I don't if it's - - I don't know nothing [sic] no more. So I'm on the stand right now telling you what I know.

Charles said that the statement he gave in April was correct. He "watered some things down" because he did not know who to trust. He further stated: "I've been taking him out of that since day one. Marshall never committed a crime[,] and I'm going to say it until I die." In his statement given on April 5, he said that they

16

wore black or blue hoods. In a statement on August 5, he said that he was scared "they would try to put [him] in it." He indicated that he was never scared of Defendant.

Charles testified that he never saw a gun that night. He testified that he "described a gun he had that I knew of."[4] Charles further testified that he knew of "him" having a double barrel sawed off shotgun. In a statement from April, Charles said that he knew "he" had a pistol. Charles explained that he saw fire come out of the barrel and that the gun was short. Charles indicated he did not know how long the gun was. He testified that he had never seen a pistol shoot fire out of the barrel. He did not see a gun on "him" that night.

According to Charles, Defendant did not have a gun when he went to Charles' house. Charles could not recall what Roberts and Defendant wore when they went to his house that night, but they were wearing hoods when he met them.

In his April 3 statement, Charles said that Roberts and Latiolais were talking about $50.00 worth of crack cocaine. Roberts asked Charles for drugs that he could sell to Latiolais. Charles did not have any. Charles said that they were walking ahead of him or something like that, which meant that he and the others were walking in opposite directions. He then testified: "I seen Timothy and Scott. I never seen Marshall. I never seen him." Charles looked at the statement and testified: "I said Scott was in the front. The white dude was passed Marshall and the middle of him and Tim." Charles clarified that Defendant was in the middle. This would have been when they were parting ways. He told Katie Morel, a former Louisiana State Police detective who interviewed him, that he did not see the face. He told her that Roberts was the shooter.

---

[4]During this discussion, there was no clarification of who "he" was.

On cross-examination, Charles clarified that Roberts shot Latiolais, that Defendant was not there when this occurred, and that Defendant wore a hood.

Charles denied telling his cousin, Ignatius Patt, that Roberts did not do it. He did not recall making a statement to Detective Morel that the shooter was wearing a hood. Patt testified that Charles was his first cousin and that he was also related to Roberts and Defendant. According to Patt, he had a conversation with Charles about the homicide the day after it occurred, and Charles told Patt that Roberts did not do it and that he did not know who did. Patt had an argument with Charles regarding the matter because Charles "said he didn't say that and I know what he told me."

Joseph Boyd was employed as a criminal investigator by the St. Martin Parish Sheriff's Office in 2002. He took statements from Defendant and Charles. Defendant's interview occurred on April 3, 2002. In Defendant's interview, Defendant said that the statement he initially gave police was inaccurate. He admitted being with Roberts, Charles, and Lewis on the night at issue. They were drinking and smoking marijuana. He and Roberts returned to Roberts' house. They went to the plant in an attempt to get a sack of crawfish and saw Mouton there. Mouton pulled Roberts to the side and asked him about "THE CHEESE." Defendant and Roberts left and were headed back to Charles' house. They met Charles in front of his house, and the group saw "THE WHITE BOY" walking toward them. Defendant and Charles went the opposite way than Roberts and the boy. Roberts and the boy were by some air conditioner vents by Las's. Defendant stated that Roberts must have hit the boy. The next thing Defendant heard was "BOMB!" Defendant further stated: "ALL I HEARD WAS BOMB! WE SHOT OUT. I WENT IN MY HOUSE, I GUESS JULIUS WENT IN THE HOUSE. I DON'T KNOW, TIM PROBABLY THREW THE GUN IN THAT POND, I

18

DON'T KNOW." Defendant stated that he saw the boy running and figured Roberts must have hit him. Defendant then stated that Roberts chased the boy and then shot him in the back. The shot looked like a flash. That was why Defendant thought it was "THAT BIG SHOT GUN." The next morning, Roberts told Defendant that he threw the gun in the pond. Defendant did not see a gun on Roberts that night. He reported that Roberts shot the boy for $50.00. He further explained:

> HE SAY [sic] THAT WHITE BOY WANTED, I GUESS TONY TOLD HIM, TONY, I GUESS TONY TOLD HIM THAT WHITE BOY WANTED SOMETHING FOR FIFTY.
>
> . . . .
>
> BUT TIMMY SAY [sic] WHEN HE, WHEN HE CHECK [sic] THE WHITE BOY, HE NEVER, HE NEVER FOUND NOTHING [sic] ON HIM.
>
> . . . .
>
> NO MONEY OR NOTHING.
>
> . . . .
>
> HE CHECK 'EM [sic], HE SAY [sic] HE CHECK IT, HE SEARCH [sic] HIM SEE [sic] IF HE HAD THE MONEY OR SOMETHING.

When asked if Roberts checked before or after he shot the boy, Defendant stated: "AFTER HE SHOT I GUESS. I DON'T KNOW, WE SHOT OUT RUNNING." Defendant said that Roberts indicated that the boy did not have an I.D. or anything. Defendant further stated: "I GUESS HE JUST WANTED TO JACK HIM." "I DON'T KNOW TO BE HONEST WITH YOU."

Defendant stated that the shooting occurred near a trailer. Defendant said that he was wearing a white shirt, shorts, and slippers and that Roberts was wearing a big navy blue sweater with a yellow collar, "Jabot" jeans, and dirty

19

Nikes. Defendant also referred to the sweater as a cheap jacket. Defendant marked several locations on a map, which was marked as State's Exhibit 39.

Boyd also took a statement from Charles. Defendant's statement was not consistent with Charles' statement. Boyd discussed the inconsistencies as follows:

> In [Charles'] statement he indicates that he's on his way back home. He's walking and puts himself approximately on the side or in front of Las's Restaurant or the country club. When he see's somebody running and then hears a gun shot.
>
> . . . .
>
> . . . [Defendant's] statement at the time of the incident they were with each other.

Boyd did not get a statement from Roberts because Roberts hired an attorney. Roberts was indicted by a grand jury for first degree murder. When asked about a motive, Boyd testified that there were insinuations of a possible drug transaction.

Sloane Turner was previously employed by the St. Martin Parish Sheriff's Office as a lieutenant in detective crime scenes. She indicated that as part of the investigation, castings were done "right on the side of Las's Restaurant." Lieutenant Turner took photographs during Latiolais' autopsy and noted that $51.69 was found. Weeks after the offense, police began a search of the septic pond at Las's and two ponds at Seafood International. They were unable to complete the search. Between 2011 and 2017, when Lieutenant Turner was part owner in Seafood International, the two ponds were searched again, and that search was completed.

Mark Kurowski was a forensic chemist at ACL and was accepted as an expert. Christopher Henderson authored a report on November 13, 2002, and Kurowski peer reviewed the report.

Kurowski testified that shoes belonging to the victim matched the castings submitted by the St. Martin Parish Sheriff's Office. The shot protector sleeve that was submitted was consistent with a Winchester .12 gauge shotgun shell, number 5 or 6 shot pellet size. Pellets from the body were a number 6 lead shot. Shells found in Latiolais' pocket were not consistent with the shell with which he was shot.

Kurowski testified as follows regarding the examination of clothing recovered by police:

> When clothing is examined it's clean the table, put a large piece of what [sic] paper, we call it butcher paper, the item is looked at, examined and shaken. It's tape lifted and the debris is kept in the paper and folded up. And the debris packets . . . they're put into these generated evidence items. And part of that examination is firearms related, looking at debris packets to see if there's any gunpowder particles in them.

Kurowski noted that "[a]fter a firearm is discharged the projectile flies out as does gunpowder particles, partially burned gunpowder particles and primer residues." Kurowski testified that one partially burned gunpowder particle was observed on item 10.02, a gray "Jersy's" brand sweatshirt. The shirt was in a bag labeled Timothy Roberts.

Kurowski testified that gunpowder particles and residue differed. Gunpowder particles were about the size of black pepper and could be seen. However, a scanning electron microscope was needed to see primer residue, and ACL did not have one.

Kurowski indicated that ACL was not a GSR free lab. There were sections of the lab that firearms did not go to, so those areas would be less likely to have GSR. ACL had never been tested. Kurowski testified that ACL took precautions to avoid or limit contamination:

A.     Correct.  The little benches are cleaned down between every item.  New pieces of butcher paper are put out.  If someone has a lab coat with long sleeves they're supposed to change them out between items or at least tape them down.  There's regulations we have to try to maintain a lever [sic] of contamination potential management.

. . . .

Q     What precautions would have been taken?

A.     The items were taken to a section of the lab that firearms are not examined or really don't ever end up in.  They used a table that wasn't - - firearms hadn't been around.  And the regular precautions we're taking [sic], the cleaning, the paper, the changing of the garments.

Kurowski was referring to 2013.

Kurowski testified that the items were originally examined in 2002 for gross gunpowder.  Ten years later they were reanalyzed, but everything had been tape lifted at that point.  "And as we tape lift we're potentially picking up a lot of microscopic level compound particles that we might be removing inadvertently."  Kurowski further testified:

Q.     Okay.  So it's not that y'all contaminated it, it's that y'all would have removed gunpowder that would have been there.

A.     Ideally the request would have been made when it first came in and then we would have treated it differently.

Q.     Right.  But that - - you'd say that's an issue, if it's more likely that y'all removed gunpowder residue than placed it on it.

A.     Yeah, that's fair to say.

According to Kurowski, ACL item 16 was the same as State's Exhibit 19, a blue Nike jacket and a pair of slippers.  When asked if there was gunpowder evidence found on the jacket as of the date of the report, he stated there was not.  Kurowski referenced a report dated November 13, 2002.

The Nike jacket and slippers were included in a single bag.  Kurowski agreed that there was the possibility of gunpowder transfer when two items were

22

together. If items were going to be tested for gunpowder, the items should be kept separate. The slippers were examined for biological evidence, but Kurowski was not sure what the results were. He noted that ACL did not recommend putting shoes with other items. He explained that it was not ideal and that shoes were nasty.

Kurowski again noted that ACL was not GSR free and that sections of the lab were dirtier than others. ACL accepted item 19 and it was opened. Kurowski was asked about GSR contamination:

Q. That means there's a possibility that GSR was transferred to it at ACL, isn't there? There is a possibility, is there not, sir?

A. There is a possibility. I would hope that - - I remember when it did come in there's a big hub-bub about like where is it going to be done? You got to clean it up and try not to have that ac running and, you know, kicking up the atmosphere.

Q. Yes. And it was a concern because there was a possibility - -

A. Yeah.

Q. - - that that item was contaminated with GSR at that time, correct?

A. It would be a pretty big concern. A lot of people were involved in it.

Q. A pretty big concern. Okay. And so, it came to pass that nine years later in 2013 ACL was once again asked to collect GSR data from that same item State's Exhibit 19 which had been contaminated with shoes and previously opened at ACL's prior, right?

A. Right.

Q. And, in fact, ACL choose to once again open it up at ACL and do the stubbing for GSR, right?

A. Yes.

Q. Okay. So there's multiple opportunities for contamination, right?

A. Yes.

23

Q.    Okay. Despite that ACL did the stubbing, did they not?

A.    Yes.

Kurowski was again asked what ACL looked for when the evidence was initially received and stated:

> [T]he large pieces . . .gunpowder flakes or residues from the primer that we can spray chemicals on to make them visible. We would spray a series of acids and buffers and we'd get a bright color pink or blue . . . but that's gross because there's so much of the powder there that you can change its color and make it visible. Scanning electron micro . . . I don't know the size of it, but it's in the submicron level of size. You cannot see it. So we're only doing what I call gross analysis, large scale, huge, you know, a piece of black pepper is gigantic if you look at it in the scanning electron microscope.

He could not say that there was no GSR on the items in 2002, there was just no visible GSR. Kurowski further noted that there was no gross residue observed using stereoscopes. When asked if it was likely that contamination occurred, Kurowski stated: "We take a lot of precautions. I would hope not." Nevertheless, he could not say it was impossible. Kurowski agreed it was more likely that they took GSR off than put it on. However, he stated: "if it's going to be work for GSR submicron level like SEM type GSR it is not recommended to take [sic] lift first" because they are removing evidence that could be found.

Phillip Stoute was a forensic chemist at ACL and was accepted as an expert in GSR analysis. He was asked to process the clothing for the collection of GSR, which was called stubbing. Stoute explained that stubbing involved a small adhesive "portion" that targeted areas where GSR was likely to accumulate. Conversely, tape lifting involved broader sheets of tape used to cover an entire surface, and tape lifting recovered trace evidence, which remained on the tape. Tape lifts were not sent for GSR testing.

Stoute's report stated that ACL was not a GSR free environment. He noted that the physical evidence section of the lab processed trace evidence as well as

firearms evidence. He stated that when this case was initially received, there was no request for GSR screening. Therefore, the items the lab received were examined in one of the screening rooms where firearms were "on occasion processed." He did not work at ACL when the evidence was initially submitted.

Stout explained that when the request for GSR testing was received in 2012, the processing was done in the vehicle exam room, which was a garage area. According to Stoute, guns were not usually handled there or brought into the area, and the garage was the cleanest screening space to do the stub collection. Stoute then explained that guns were not brought to the particular area of the garage where the stubs were taken. However, there was a vice in the room that was occasionally used to pry guns open. Thus, guns had been brought into the back corner of the garage. Additionally, cars in which people had been shot had infrequently been brought into the garage for processing, and those cars would potentially contain GSR. After being asked about people entering and exiting those cars, Stoute confirmed that GSR may be present in the garage.

According to Stoute, GSR particles do not degrade but were transferrable. He had no idea if the "GSR particle was positive" on March 29, 2002.

Stoute testified that while performing stubbing, the table was cleaned in between items, fresh screening paper was used, and items were separated by "time, space." Stubbing from each item was placed in separate envelopes. Each stub was self-contained in a vial.

According to Stoute, the St. Tammany Parish Sheriff's Office Crime Lab (St. Tammany Crime Lab) considered a kit to be four stubs, so ACL instructed the St. Tammany Crime Lab which stubs to include in each kit. Each report from the St. Tammany Crime Lab referred to a kit. Stoute testified that GSR was detected on the gray "jersy" sweatshirt collected from Roberts' residence, the blue Nike

jacket from Defendant's residence, and the jean shorts from Defendant's residence. Shorts taken from Defendant's residence contained one "microscopic tri-component particle[]." The single particle was found in stubs taken from inside the right pocket, the waistband, inside the left pocket, and the front of the shorts. The scientific analysis report stated:

> Based on the morphology and the elemental composition of this particle, Marshall Alexander may have discharged a firearm, been in close proximity to a discharged firearm or come into contact with a surface containing microscopic tri-component particles . . . .

> The presence of such a limited number of particles in this sample has only limited evidentiary value.

A blue Nike jacket was also analyzed. Stubs were taken from four locations on the jacket, including inside the right sleeve, inside the left sleeve, inside the back, and inside the front. Testing found three microscopic tri-component particles. The report set forth the same information regarding the source of the particles and their evidentiary value. Stubs were also taken from the right front pocket, the left front pocket, the back, and the inside front pocket of the Nike jacket. One microscopic tri-component particle was found when testing these stubs. The scientific analysis report stated the same thing regarding the origin of this particle and the value of the evidence. Stubs were also taken from the front, the left sleeve, and the right sleeve of the Nike jacket. Eight microscopic tri-component particles were found in these stubs. The scientific analysis report set forth identical information as that in the other reports regarding the origin of the particles. However, the evidentiary value of the evidence was not addressed in this report. There were a total of twelve microscopic tri-component particles on the Nike jacket. Per Stoute, the presence of GSR indicated that someone either discharged a weapon, handled a weapon, or contacted a surface containing GSR particles.

Stoute testified that the gray "Jerzees" or "jersy" sweatshirt taken from Roberts' residence contained three microscopic tri-component particles. The scientific analysis report indicated that four stubs were taken from the sweatshirt consisting of one from the back, one from the front, one from the right sleeve, and one from the left sleeve. The report further stated:

> Based on the morphology and the elemental composition of this particle Timothy Roberts' [sic] may have discharged a firearm, been in close proximity to a discharged firearm or come into contact with a surface containing microscopic tri-component particles . . . .

> The presence of such a limited number of particles in this sample has only limited evidentiary value.[5]

No other stubbing kits submitted for GSR analysis contained particles.[6]

When asked what the significance of the number of GSR particles was, Stoute testified that there was no cut-off at his prior place of employment. One particle was positive, and no particles were negative. He noted that the Army lab used four particles as a limit, so anything above four was positive. That cut-off was due to the fact that the lab dealt with people that regularly carried guns. He believed the cut-off was four particles on the same item. Stoute was asked if four was a conservative standard and responded, "I think it is, but I don't know, there may be other labs that use a higher standard, I'm not sure." Stoute was also asked if twelve particles were a significant amount. He replied that he did not look at the number of particles as a little or a lot but only as positive or negative.

When asked how contamination affected test results, Stoute testified: "Particles could be imparted on that item that weren't present on that item to begin with. Or particles could be removed from that item." Stoute said that there was no

---

[5]Although the report references Roberts, his DNA was not found in swabs taken from this shirt.

[6]Stubs from a blue/gray Nike sweatshirt, jeans, and a blue Jerzees sweatshirt associated with Roberts and a blue hooded Athletic Works sweatshirt associated with Defendant did not contain GSR particles.

way to quantify how many particles could have been imparted on an object and that particles could be removed from tape lifting. Stoute admitted that he would never know how contamination impacted what was actually present. He agreed that in this particular case, there was a possibility that evidence tested at ACL was contaminated at ACL since it is not a GSR free facility and because the request for testing was not made until ten years after the evidence was received.

State Exhibit 19, which was the blue Nike jacket identified as ACL item 16, was bagged with a pair of slippers. Stoute indicated that the shoes could be a possible source of contamination. ACL instructed agencies that if a pile of clothing was found, it was acceptable to submit the items in the same bag because they had already been in contact with one another. In this case, no one asked for the slippers to be tested. Stoute testified that it was impossible to know when GSR landed on the jacket. That item had to be in the presence of a gun being discharged or contacting a surface. The DNA analysis showed that the jacket contained a mixed partial profile consisting of DNA of at least two people. Latiolais and Roberts were excluded, but Defendant was not.

Stoute was further questioned about contamination. He stated that it was possible for contamination to occur in areas where the evidence bag was opened, which would include an area where police regularly walked. If there were no holes in the sealed container, one would not expect contamination by walking through a police department. The ACL evidence custodian did not note any holes in the packaging containing the Nike jacket when it was received by the lab.

Stoute was asked if it was more likely that GSR was placed on the item or taken off the item through processing at the lab. He responded, "Both processes were in play so it's hard to really interpret what is more likely or less likely." He was also asked if it was more or less likely that contamination would be on the

interior of clothing or inside pockets. Stoute indicated it would "depend on how the clothing was exposed whenever it was processed originally. If the inside of the clothing was processed then there is potential. If the inside was never exposed to the environment there is less possibility that it could be potentially contaminated."

John Bruce was a former employee of the St. Martin Parish Sheriff's Office. He reiterated that Latiolais lived across the street from where his body was found. Officer Bruce noted that Latiolais' home was searched. He also took part in the search of the ponds. He verified that no weapon was ever found. Officer Bruce also assisted the State Police during their investigation. According to Officer Bruce, there were no suspects other than Defendant, Roberts, and Charles.

Jermaine Alexander, Defendant's brother, was incarcerated at the time he testified. He did not live in the area at the time of the homicide. He lived with Mary Landry, Yancy's mother. Jermaine and Yancy had a falling out. Jermaine testified that Roberts was his cousin and lived on the same property where Jermaine's mother lived. Jermaine's mom and Roberts' father were siblings. Jermaine also knew Charles because they grew up together.

Jermaine did not recall having a conversation in front of Mary regarding his brother being the shooter. He was familiar with a gun called "tonka toy," which was a Tech-9 that he owned. Jermaine testified that he never owned a sawed off shotgun. He was familiar with Creighton Calais, and there was an incident between the two. Jermaine was asked if the allegation involved him shooting a sawed off shotgun at Calais, and Jermaine asserted his Fifth Amendment privilege.[7] Jermaine did not remember having a conversation about a gun with Mary or Yancy. Additionally, he never hid or concealed "that gun."

_____

[7]There was no testimony as to when the alleged incident occurred.

Jermaine acknowledged being in court with Defendant, Roberts, and Charles. He did not recall Roberts' aunt, Sylvia Roberts, being there. Jermaine testified that Defendant visited him at Mary's home. He did not recall that Mary was home the one time Defendant visited, which was after the homicide. The two did not talk about the homicide, and he did not talk to Roberts or Charles about it either. Jermaine did not recall hearing any tape with all the suspects on it. When asked if the State Police ever discussed a tape with him, Jermaine exercised his Fifth Amendment privilege again. He was further questioned as follows:

> Q. Do you recall having a discussion with Marshall Alexander at Mary Landry's house about disposing of the sawed off shotgun used in this crime?
>
> A. No, ma'am.
>
> . . . .
>
> Q. Do you recall stating that y'all had disposed of it in a septic tank?
>
> A. No, ma'am.
>
> Q. Do you recall stating that no one would ever find it?
>
> A. No, ma'am.

He did not recall having a similar conversation with Yancy.

Jermaine was not present the night Latiolais was shot. He agreed that any conversation he ever had about the shooting or that he could have ever had was based on the word on the street.

Mary testified that Jermaine was her former drug dealer. Mary acknowledged that she smoked a lot of crack when she lived with Jermaine. The two had lived together for approximately eight months sometime before she was in drug court in 2004. Defendant had been to her home several times. Mary testified

that she overheard a conversation between several people.[8] She then stated she overheard a conversation between Defendant and Jermaine in which Defendant "was answering his brother about a weapon being displaced."

Carolyn Booker was accepted as an expert in DNA analysis. Booker testified the wrist area of a Nike sweatshirt labeled Roberts contained a mixture of DNA from at least two contributors. Roberts could not be excluded, but Defendant and Latiolais were excluded. The interior collar area of the sweatshirt contained a mixed partial profile of at least two contributors. The major contributor was Roberts, and Defendant and Latiolais were excluded.

Booker testified that the Nike jacket labeled with Defendant's name was examined. The interior wrist area had a mixed partial profile of at least two contributors. The major contributor matched Defendant, which meant his DNA was there in a greater quantity. Latiolais and Roberts were excluded as contributors. The swab from the collar area also had a mixed partial profile of at least two contributors. Defendant could not be excluded, but Latiolais and Roberts were excluded. According to Booker, there was no way to know to whom the jacket belonged although Defendant was the major DNA contributor. Booker indicated that samples from the waistband of Girbaud shorts consisted of two contributors. Defendant could not be excluded, and Latiolais and Roberts were excluded.

Booker also swabbed the interior neck and cuff area of a "Jersey" sweatshirt, which both contained partial DNA profiles. Latiolais, Roberts, and Defendant were excluded as contributors. Booker suggested that the sweatshirt belonged to someone else or that the neck and cuff area of the shirt did not come into contact with enough of the skin to leave a DNA profile. This could occur if the wearer had

---

[8]Mary was not asked when or on what date this conversation occurred.

a long sleeve shirt on or a high collar shirt that prevented the skin from touching the surface of the sweatshirt.

Booker testified that DNA testing could not determine when a person wore an item. DNA could degrade depending on the way an item was stored. Booker indicated that cross contamination from shoes or fleece lined slippers to a jacket was possible if the shoes had lots of DNA on them and came into contact with the specific areas of the jacket that were swabbed. Booker was shown the bag containing the Nike jacket and slippers and asked if she would expect the two slippers and the jacket to come into contact inside the bag. Booker stated: "just kind of common sense it's not a real big bag and so there's not a lot of room for things to be shaken around in there. So where the surface of the slippers are touching the jacket, yes, there possibly could be DNA transfer." Packaging the two items together created the possibility of contamination.

Detective Morel testified that she met with ADA Cedars in August 2012. He referred the case to the State police because additional information had been brought to his attention. Detective Morel conducted a new investigation. She did not look at the St. Martin Parish files.

Detective Morel interviewed Mary first and then interviewed Jermaine. Police conducted a search for weapons and found weapons, narcotics, and money on Jermaine's property. He confessed to ownership of the drugs and money but not the weapons. None of those weapons were used to kill Latiolais. The septic tanks on Jermaine's property were searched on August 17, 2012, and nothing was found.

Detective Morel testified that Mouton was receiving threats from "the family." Police also interviewed Calais, who said that he was "familiar with

Jermaine Alexander having possession of a sawed off shotgun." Calais did not know anything about the homicide.

Detective Morel interviewed Defendant twice. She summarized the first interview:

> [H]e went into much detail saying that him and Timothy Roberts had -- there was information that they were trying to get some crawfish next door at the seafood place and he couldn't. There was a gentleman named Tony Mouton that lived across the street from them. Scott Latiolais apparently was looking for some drugs that night according to Marshall. Marshall and Timothy went into the field near the old Las's Restaurant which is actually the location where the shooting took place. They met up with Julius Charles and asked Julius if he had any crack that, according to Marshall, any crack that Timothy could sell to Scott Latiolais. And Julius told them that he did not have no [sic] crack to sell to them. And Marshall says that when Timothy Roberts stepped away to talk to Scott Latiolais, who had walked in the field, Marshall said he stood by Julius Charles while Roberts had stepped away to talk on two different occasions. Once he said those two groups were approximately twenty (20) yards apart and at one point he says they were approximately a hundred (100) yards apart, but either way he said he really couldn't hear what the context of the conversation was between Timothy and Scott Latiolais, which again, Marshall said he was standing next to Julius . . . [.]
>
> . . . .
>
> . . . So at some point Timothy, I mean, Marshall says he hears, he see's [sic] them conversing, Timothy and Scott conversing and at some point he hears a loud boom, which he understood to be a shotgun blast. He said at some point he says [sic] he see's [sic] a muzzle flash and hears a boom and he takes off running back towards the direction of his house. He hears someone running behind him, he doesn't know who that person is. At first he thought it was Julius Charles. He later said he finds out that it's Timothy Roberts running behind him.

Detective Morel further testified regarding her first interview with Defendant:

> After they heard the boom and they ran out of the field, and again, Marshall was not sure, contradicted himself. At first he said he was in front of Timothy and then he said Timothy was in front. They ran across the street to their property, which is the Roberts Alexander property. The family was out on the porch because they had heard the boom but Marshall didn't think they were overly concerned about it because it may have been a truck backfiring on the interstate, but it didn't concern family because they did come outside. Marshall said he and Timothy ran past the people on the porch. He doesn't think they

conversed at all. They ran towards the middle of the yard where there's a large tree and he said they stopped to rest. Then he said Timothy went back to the back of the property where there were two oxidation ponds from the seafood plant. And he said he followed Timothy up there and there's two ponds. He said they walked to the left side, depending on which time you talked to Marshall because the story did change. First it was the left side of the pond, then he wasn't sure if it was the left side of the pond. Then he said they stopped at the back corner of the pond and he saw Timothy throw the shotgun into the first pond. Then he changed his story and said they continued walking so me [sic] must have thrown it in the second pond. And then in the same interview he said, no, it must have been the first pond. And then he said he wasn't sure if it was the first or second pond. He said it was real dark, dark, dark and then, he said he could see the shotgun, so I don't know.

Defendant first said he never saw a gun. He then said he only saw the shotgun when he saw the muzzle flash. He then changed his statement and said he saw it another time when it was thrown in the pond.

According to Detective Morel, Defendant described the gun as a double barrel sawed off shotgun that Roberts bought off the street in Lafayette. Defendant said that if it had been a full sized shotgun, he would have noticed it when they were walking in the field, but he previously said he saw it in the field. He later said it was a black and brown, pistol grip, double barrel shotgun. He was sure it was thrown in the oxidation pond. According to Detective Morel, the pistol grip shotgun described by Defendant was not the gun used in the murder, as the murder weapon was described as .12 gauge, single barrel, pump action, sawed off shotgun.[9]

Detective Morel was asked if she questioned Defendant in the first interview about what he wore:

A.   . . . First he said it wasn't cold, so they weren't wearing jackets. And then he said they were wearing jackets. Then he specifically remembered wearing a blue Nike jacket that night. Later on that was contradicted by him saying I didn't wear the Nike jacket. He said that

---

[9]There is no other testimony in the record regarding a pump action shotgun.

they didn't, that it was not a normal behavior for him or Timothy to switch clothing at any time. And then when I brought up who was wearing what clothes and was there a possibility that he was wearing certain things he said, well, he must have - - I think his words were he must have lied, that they probably had switched clothes.

Q.    Okay.  Would that have been the first interview or the second interview?

A.    In the first interview is when I found out he said he was wearing a blue Nike jacket.

Q.    Okay.  And that interview occurred when?  What was the date of the interview?

A.    The date of his first interview was December 11th, 2012 and it took place at the Iberia Parish Sheriff's Office Detective Center.

        . . . .

Q.    Okay.  Was he able to describe Timothy Robert[s'] clothes?

A.    In his first interview he definitely said he was wearing a blue Nike jacket, it was only later that he recanted that.

Q.    And that was Marshall's clothes, right?

A.    Marshall was saying - -

Q.    That Marshall was wearing them?

A.    - - that Marshall was wearing the blue Nike jacket.  That was established by him in his first interview that he was wearing a blue Nike Jacket.  That was later contradicted in his second interview.

In the second interview, Defendant contradicted himself regarding wearing the Nike jacket.

Detective Morel was asked if Defendant described Roberts' clothing during his first interview and answered:  "I know I asked him if he and Roberts had traded any of their clothing on that that evening and he seemed surprised and said they had not exchanged any clothing, no shirt, no shoes, no jacket and he added that he had not taken a bath that night."  Thereafter, Detective Morel testified that Defendant stated that "Roberts must have been wearing some type of jacket that

35

night because Roberts had only been wearing a shirt with long sleeves, Alexander would have noticed the gun. He said he never saw the gun until Roberts shot that boy in the back."

As a result of Detective Morel's first interview, the septic tanks on the Alexander and Roberts properties were searched. Oxidation ponds were also searched. Detective Morel was told that Roberts lived next door to the ponds. The ponds were drained but contained "quick mud," which was just like quicksand but that if a gun was present, it could be found by equipment. Nothing was found in the ponds even with the use of an industrial metal detector and a magnetometer. Equipment could not find it if it was not there. Detective Morel acknowledged that it was possible that during ten years, the gun could have been removed.

Thereafter, Detective Morel requested GSR testing. Detective Morel testified regarding her conversation about the GSR testing with Dawn Powell, an employee of the St. Tammany Crime Lab, as follows:

> She said the blue Nike jacket had eight tricomponent particles on it. One was on the back of the jacket and one was inside the front of the jacket. Two particles were inside the back of the jacket and one was inside the right front jacket pocket. One was inside the right sleeve of the jacket and one was inside the left sleeve of the jacket. Also one was inside the left front jacket pocket.

> . . . .

> The blue jean shorts that Alexander was said to be wearing and I might add on the blue Nike jacket I'm saying Alexander's blue Nike jacket because in his first interview he said he was sure he was wearing a blue Nike jacket, so I'm referring to it as his. The blue jean shorts had four tricomponent particles. One inside the right front jean pocket. One inside the waistband of the jean shorts. One inside the left jean short pocket. And one inside the jean shorts.

Detective Morel testified about other clothing tested as follows:

> On Timothy's sweat shirt, which he was identified as wearing a sweat shirt that night they had only three tricomponent particles. One was on the outside sleeve and two were on the back of the sweat shirt, nothing on the inside.

As a result of GSR testing, she wanted to interview Defendant again.

According to Detective Morel, in Defendant's second interview, he said the same thing regarding he and Roberts going to the field and meeting Charles. He reiterated that Roberts and Latiolais spoke. He then heard a boom. Detective Morel's testimony continued:

> He interrupted me and said, no, I actually shot him. And I said - - he instantly retracted that and said, I didn't actually shot him. And I didn't want to pressure him in this interview, although, I could have I didn't. I said, wait, you actually shot him? And he said, no. And I said, excuse me, let's try this again. No, I actually saw him shoot him, shot him. And I said, are we talking about Timothy? And he said, Timothy Roberts. I said, oh, okay. So I went on with the interview, I didn't pressure that, I didn't expound upon it, I let him say his own words and then I went on with the interview. And he talked about, you know, going back to the house. Talked about the gun and the two ponds and we talked about throwing guns in the pond. He got confused when we asked him running out of the field you ran towards your house, your family was on the porch, you stopped and talked to Timothy, y'all took a rest at the tree. I said, did Timothy say anything and he got confused and he said, I don't know, nobody asked me that. And I said, well, did y'all say anything? And the [sic] my Sargent interrupted and said, wait, you heard a boom, you ran, Timothy ran, your families on the porch obviously because they heard a boom and did anybody ask you anything? And he said, no, he didn't think he had talked to them. And he said, well, wait a minute if the boy was shot with a gun and y'all running out the field with a gun, where's the gun? And he seemed extremely confused and said, huh, that's a good question. And Sargent said, well, you said, you said Timothy shot him and you said Timothy's with you running out the field, where's the gun? He goes, huh, I don't know. In fact let me know say anything he didn't say [sic]. I'll tell you exactly what he said. The Sargent had asked him how was Timothy wearing that gun and he said, quote and unquote, "Dude, that's a good question." And I said, cause y'all ran across the street. And Marshall said, 'cause [sic] somebody would have seen him. Yeah, you [sic] Momma would have saw it, or you know, they heard bow [sic], you ran across the street, the gun was in his had [sic], like what are y'all doing. And Alexander just still seemed confused. He says, that's a good question. And I said, well, you obviously, you didn't get rid of it. And he kept saying, that's a good question, I wasn't even thinking of that, nobody said that, nobody say [sic] that. So he was just confused about the whole thing. He never could answer the question.

Detective Morel said that Defendant was cooperative, but when she started asking specific questions, he got extremely nervous. Defendant subsequently told her that he did not like guns, never held one, and did not shoot one.

Detective Morel asked Defendant if he was sure that he was wearing the blue Nike jacket on the night of the shooting, and he said yes. When Detective Morel asked: "what if I told you that there's gunshot residue on that blue Nike jacket," Defendant instantly said: "well, I must have lied, I must have lied, I wasn't wearing the blue Nike jacket, it must have been Timothy." Defendant stated that they sometimes exchanged clothes, which was a contradiction to what he said earlier about them never exchanging clothes. Detective Morel was asked if she "pinned [Defendant] down on that specific issue in the first interview," and she responded: "Yes, yes, I did. And when I asked him for an explanation he said, you got me by surprise, that's something new, that's something new. He hadn't heard that before."

Detective Morel then testified about questioning Defendant about the gun:

> I don't remember if it was the first or second interview, but I know he insisted that the gun was a sawed off shotgun that Timothy Roberts had bought on the streets of Lafayette. At one point he said he bought it and then he contradicted himself and said that Timothy had bought the gun. . . .
>
> . . . .
>
> . . . he knew exactly what type of gun it was because . . . "I'm the one who bought the gun about two or three months before." And I said, you went buy the gun? And he was confused. He says, no, I didn't buy the gun, I bought the gun. So he was a little bit confused. He said it was a sawed off shotgun double barrel. But he later stated that Roberts was the one that purchased the gun on the street.

Detective Morel was asked about Defendant's statement that he shot Latiolais. She testified that when asked why he said he shot Latiolais, Defendant said, "'I didn't mean to say I shot him. I might have assumed. It just slipped.'"

Based on the evidence she collected, Detective Morel suggested to ADA Cedars that Defendant was the shooter.

Detective Morel testified that she took possession of the evidence, logged it, and relabeled it so that it would be identified as State Police evidence. Rubber gloves were used during the process. If bags had been opened, gloves would be removed, hands would be washed, and new gloves would be put on for each new piece of evidence.

Detective Morel testified that in the second interview, Defendant stated that his mother would not allow guns in her house. The further they got into the second interview, the more agitated Defendant became and the more nervous he became. According to Detective Morel, Defendant was having trouble remembering and was contradicting things that he said in his first interview.

Detective Morel testified that she collected an audio tape wherein several people, including Defendant, were discussing the offense. Defendant was "pretty quiet" during the recording. Roberts' aunt, Roberts, Jermaine, Charles, and Defendant were present. Detective Morel did not recall what Defendant said on the tape.

On cross-examination, Detective Morel testified that her initial search of the ponds was done on August 17, 2012, more than ten years after the crime. She did not know until during her fourth or fifth search that the initial searches were not complete. Detective Morel testified that she did not review all of the St. Martin Parish records because she wanted to do an independent search and that she did not read the St. Martin Parish report in its entirety. She did not know what the added information that ADA Cedars spoke about was. Detective Morel was unaware of the results of prior grand jury proceedings.

Detective Morel was questioned by defense counsel about the blue Nike jacket:

Q.    Thank you. Now I'd like to focus specifically on the blue jacket. During that interview you indicated on several instances that Marshall Alexander told you he was wearing a blue jacket. Do you remember that?

A.    I remember he was saying he was wearing a blue jacket, yes.

Q.    Okay. You're sure that that's what you remember?

A.    What that he was wearing - - I'm going by the evidence that was bagged and tagged that had - - from St. Martin that said the blue Nike jacket was from him.

Q.    Okay. So let's start with the bagging and tagging because we've heard from the investigator who picked it up and we have in evidence the authorization to go into the house and get it. And when that evidence was picked up you understand that Marshall Alexander was not even in the home, right?

A.    I wasn't there, I don't know.

Q.    So it's another detail that you're not certain of.

A.    I don't know what St. Martin did with that thing.

Q.    But in your interview we just heard you say that according to you those clothes were taken directly from Marshall by the St. Martin Parish Sheriff's Office. So you asserted in that interview. Are you telling me that was an incorrect assertion?

A.    No, I had seized the evidence by then and it was on the evidence tracking that St. Martin had seized it from Marshall Alexander.

Q.    Your statement went beyond that. You said it was taken directly from Marshall Alexander. That is an incorrect statement, isn't it?

A.    I don't know what you're saying. I wasn't with St. Martin back then. I don't know if they took it from him, if they took it from his house. I'm just telling you that the evidence was bagged that said that blue Nike jacket came from Marshall Alexander.

        . . . .

Q.    The state was, well, that's what they took off of you, so you must have had it on. That was your question to Mr. Alexander.

40

  . . . .

A. If that's what the transcript said, that's what I said.

  . . . .

A. He could have corrected me on that.

The questioning continued:

Q. Okay. I've got ever [sic] statement in this and I would like you to direct me to where Marshall Alexander has ever said he was wearing that blue jacket.

A. He could have corrected me. I can say anything I want in that interview.

Q. So you acknowledge that he never said he was wearing the blue jacket, right?

A. I believe he did say he was wearing a blue jacket at the time.

Q. You have your notes of the important things. Can you tell me where to look for it?

  . . . .

Q. Miss Morel, we were talking about the blue jacket 26 and I had asked you about your statement that Marshall Alexander told you he was wearing a blue jacket. He never told you that during your December 11th, 2012 interview did he?

A. Which was his first interview.

Q. With you?

A. Right.

Q. He never told you he was wearing a blue jacket.

A. He told me that he told the truth to St. Martin Parish Sheriff's Department and St. Martin Parish Sheriff's Department logged the blue jacket as his.

Q. They logged it as his which is different than him telling them it was his, right?

A. I don't know what they told him because I didn't read their report.

Q.     Okay. So you were just assuming that because his name was on the evidence that it was his, right?

A.     It's not an assumption if it's logged as evidence. I mean I don't know how St. Martin does their evidence. I know if I took something from someone it's theirs.

Q.     Okay. So just to confirm my previous question, Marshall Alexander never told you during any interview, during that December 2012 interview that he was wearing that Nike jacket, right?

A.     During that interview, no.

Q.     No. He didn't. So when you, when you suggested that he told you that during his interview we just watched that was a misstatement, right?

A.     No, he can disagree with me at any time. I can say anything I want all he had to do was disagree with me.

Q.     Okay. And you don't he ever [sic] disagreed with you?

A.     He disagreed with the fact that the gun particles was [sic] on the blue Nike jacket. It was only towards the middle and end of interview that he even stated that it might of not been him wearing the jacket. He said he might have lied, it might have been Timothy wearing the jacket.

Detective Morel testified that she was provided statements from the St. Martin Parish Sheriff's Office's investigation, but she did not know if she read through them. Detective Morel did not believe that she used Mouton's statement that Roberts and Defendant were wearing black jackets with hoods that night. She did not recall reading any statements, including that given by Charles.

Detective Morel testified on redirect that there were several references to "the jacket" in Defendant's second interview. Detective Morel read from a transcript:

This is - - I'm speaking. I think one of y'all had some jeans on with a sweat shirt and a Nike jacket. I think you had a Nike jacket on, right? His answer: Uh-huh (indicating affirmatively). Did you - - no, the question: You had the blue Nike jacket. What type of pants did you have on? If I had a blue jacket I probably had blue jeans on. You had some shorts on. Shorts under your pants. I don't think so. Well, that's what they took off of you, so you must have had them on.

42

State's Exhibit 50, Detective Morel's first interview of Defendant, was played for the jury. Therein, Defendant recalled drinking and getting high with Charles, Roberts, and someone named Reginald. Defendant and Roberts left because they wanted to get free crawfish and told Charles they would be back. Defendant reported that he and Roberts later met up with Charles on a gravel road near the pond. Roberts purposely broke away from Defendant and Charles and went to talk to Latiolais. Defendant and Charles were on the gravel road twenty feet away from Roberts and Latiolais, but Defendant could not hear them. It looked like Roberts and Latiolais were arguing. Latiolais subsequently ran, and Roberts chased him. Roberts was about five feet behind Latiolais when Roberts shot Latiolais. Defendant reported that he and Charles took off running, and he did not know where Charles went. Roberts was thirty seconds behind Defendant. Roberts then threw the gun in the pond and went to his house.

During Detective Morel's first interview with Defendant, Defendant indicated that he did not know where Latiolais lived. Defendant again stated that Roberts was the only one with Latiolais. Defendant said that he probably saw smoke or something when Latiolais was shot and that there was no way it could have been anyone else who shot Latiolais. When asked if he saw a muzzle flash, a gun, or light, Defendant stated: "I don't want to lie to you, I probably seen a . . . smoke, you know." When asked if he saw the gun, Defendant said, "No, I couldn't see the gun. Yeah, yeah, I ain't gonna [sic] lie to you. I sure did. A shotgun." He described it as a small shotgun, demonstrating with his hands. Defendant knew the size of the gun because he saw it when it was thrown into the pond. Defendant said that if the gun was a long gun, he would have seen Roberts walking with it. According to Defendant, after Latiolais was shot, he and Roberts were running side by side by the time they got to the seafood place. Defendant was extensively

questioned about seeing the gun and where Roberts threw the gun. Detective Morel wanted to know how Defendant knew Roberts wanted to throw the gun in the pond and how he knew to follow Roberts. Defendant said that he did not know. "I was running, he was running." Defendant then discussed which pond Roberts threw the gun in and drew the area and location where they went.

Defendant told Detective Morel that he was telling the truth. The discussion about the ponds continued. According to Defendant, Roberts threw the shotgun, and it was the only gun he had. Roberts got the gun from someone in Lafayette for $60. It was a sawed off, double barrel shotgun. Roberts had the gun for about a month.

Defendant noted that Roberts was selling drugs. When asked if the event was drug related, Defendant answered that it "had to be." Defendant did not know any other reason for the offense. Defendant said that all he did was smoke weed and drink. They again discussed the location of the gun in the pond.

Defendant said that he went back home after Latiolais was shot. He and Roberts did not talk at all. Defendant went straight to his room. It was late, but he did not sleep because he heard the ambulance. Roberts knocked on his window about 6:00 or 7:00 a.m. The two then walked toward the street and got picked up for questioning. Defendant said that he lied to police because he was scared and did not know what to do. He told the truth to police the second time he spoke to them. Defendant reiterated that Roberts was the shooter. He said that he was telling the truth in this interview.

Defendant informed Detective Morel that one time when he was supposed to go to court, Roberts called him and said that if he would not go to court, the charges against Roberts would be dropped. Therefore, Defendant did not go to court and was working offshore.

44

Defendant then went through the offense again, stating that one shot was fired. He saw Latiolais fall, and then he and Charles ran. Defendant said that he knew for a fact that Roberts was the shooter and that no one else was involved. Defendant indicated that he did not speak to Mouton that day. Roberts may have spoken to Mouton while Defendant was inside his house. Defendant saw Latiolais walking from the highway. He did not see Mouton or Latiolais talking to Roberts.

Detective Morel asked Defendant if he and Roberts changed clothes. Defendant said no. He then indicated that it was not cold. Defendant said that he never saw the gun until Roberts shot Latiolais. Roberts went straight to Latiolais. Roberts never left to get a gun. Roberts had to have the gun on him, but Defendant did not see it. The gun had a black and brown handle. It was so dark when Roberts threw the gun in the oxidation ponds. Defendant said that he and Roberts never spoke about it after the fact. Jermaine was not there, and Defendant did not talk to him about this.

Detective Morel's second interview, State's Exhibit 51, was played for the jury. Detective Morel and Defendant went back though the events regarding Latiolais' death. Defendant said that Roberts walked toward Latiolais, and Charles and Defendant stayed on the side. Latiolais ran, and Roberts ran after him and shot him. When Defendant heard the boom, he and Charles ran toward their own homes. The following exchange occurred:

Morel: So you said you heard a boom?

Defendant: Uh huh. No, I actually shot him. . . . Nah. Nah, I ain't shoot him.

Morel: Wait, you actually shot him?

Defendant: No. (laughing and leaning his head back)

Morel: Excuse me, let's try that again. (laughing)

Defendant: No. I actually saw him shoot him, shot him.

Morel: We talking about Timothy now?

Defendant: Timothy Roberts.

Morel: You actually saw him shoot him?

Defendant: Yes, ma'am.

Defendant then informed Detective Morel that Roberts used a sawed off shotgun, which he knew because he was with Roberts when he threw it. Defendant then asserted that he was one hundred percent sure Roberts shot Latiolais. He explained the offense again, saying that Latiolais was walking and that Roberts walked up to Latiolais. Latiolais ran, and Roberts shot him. Latiolais fell immediately, and Roberts ran. Defendant did not see Charles after that. Defendant ran through the seafood place, and he and Roberts ran by the tree near their homes. Everyone was outside, but Defendant's family thought a car had a blowout. Defendant and Roberts walked in the back by the two ponds. The gun was thrown in the pond, and Defendant explained which one.

Defendant was asked if he saw the gun and how Roberts was carrying it. Defendant said: "I didn't think about that. Nobody saw it." Defendant said that Roberts had to disguise it because someone would have seen it. Defendant said that he saw the gun when Roberts shot it and when Roberts threw it. He did not see the gun when they walked to the field. The only way he knew Roberts had a gun was when Roberts shot Latiolais. Defendant was asked how Roberts got to field without him seeing the gun. He then stated that he did not think they had jackets on.

Detective Morel and Defendant discussed the gun again. Defendant described the gun as short, and said he was with Roberts when he bought it. It was a double barrel, sawed off gun. Defendant did not know if the barrel or stock had

46

been shortened. Defendant said it had to be the gun Roberts used, and Roberts paid $40 cash for it. Defendant said he did not handle the gun, and he did not play with guns or shoot them. He was not with Roberts when Roberts had ever shot the gun. Defendant said he was about 100 feet away when Latiolais was shot. He could not hear what Roberts and Latiolais were saying.

Defendant addressed the lighting in the area of the ponds. Defendant was pretty sure there had to be light back there due to the width of the area. Defendant knew Roberts threw the gun because Roberts shot Latiolais. Defendant said he heard a splash.

In his second interview with Detective Morel, Defendant stated that Roberts knocked on Defendant's window that morning. Defendant did not tell police the truth. He was trying to help Roberts out. Detective Morel asked Defendant if he shot Latiolais after she questioned him about whether police asked him if he shot Latiolais. Defendant responded, "Oh, no. They thought I did. I don't know. I don't remember. That was the first time they pick [sic] us up." Detective Morel then asked if Roberts shot Latiolais. Defendant said yes and agreed that Charles witnessed it. There was no doubt in Defendant's mind that Roberts shot Latiolais.

At some point, Defendant and Roberts were in the same cell in general holding. Defendant asked Roberts what he was going to do because Defendant had a family. Defendant told Roberts not to say anything, and Roberts said, "I got you. I got you."

Detective Morel asked Defendant, at approximately 42:00, why he said he shot Latiolais earlier in the interview. Defendant responded:

Defendant: No, I ain't shoot him.

Morel: That's what you said earlier. Were you mixed up? What happened here? What?

47

Defendant:  I don't' know. I . . . all messed up.

Defendant noted that the offense was ten years ago and that he could not tell her exactly word for word what happened.  Detective Morel said that she wanted a generalization.  Defendant said:  "I ain't mean to say I shot him. I know I ain't shoot him.  It just slipped."  Defendant laughed and said that if he did shoot Latiolais, did she think he would say he did.

Defendant again said that he was positive that he never shot the gun and had never shot a gun in his life.  He noted that he was one hundred or more feet away when Latiolais was shot. He told Detective Morel that Roberts kept the gun at his mom's house and that Roberts never asked him to store the gun.  Defendant said that his "momma don't play that."

Detective Morel then discussed clothing with Defendant.

Morel:  Y'all were dressed.  It was cool that night.  Y'all were dressed, I think that you told me in your own statement I had asked what you were wearing I think y'all had some Girbaud jeans on and a sweatshirt . . . I think you had a Nike jacket on, right?

Defendant:  Uhuh.

Morel:  You had the blue Nike jacket.

Defendant: Uhuh. If I had a blue jacket, I probably had some blue jeans on.

Morel:  I know you had some Girbaud shorts on under your pants.

Defendant:  (pauses)  I don't think so.

Morel:  Well that's what they took off of you, so you must have had them.

Defendant:  When.

Morel:  When they collected clothes.

Defendant told Detective Morel that police took his clothing a couple of weeks later.  She asked: "But you told them that's what you were wearing, right?

Whatever they collected, you didn't lie to them . . . ?" Defendant denied doing so. Detective Morel followed up: "So, you said, look, I was wearing this and I was wearing this (gesturing)?" Defendant said that police took everything, including clothing and shoes.

Detective Morel indicated that GSR evidence showed that Roberts had very little on his clothing and that all of Defendant's clothes had GSR, including his jacket. Defendant laughed and wanted to know why his clothes had GSR. He then said that he and Roberts shared clothes. Defendant then said that there was no evidence of GSR because he did not shoot anyone. He was positive that he did not carry the gun for Roberts. Defendant then stated that Roberts must have had the blue jacket on that night or the blue jeans. The following exchange resulted:

> Morel: When I asked you what you were wearing that night, that's what you described.
>
> Defendant: A blue jacket?
>
> Morel: Yeah. Blue Nike jacket. Tell me how that can happen. . .
>
> Defendant: There's no way they found evidence on me. . . . my jacket, my jeans.

Defendant then asked how the GSR got on his clothes. When Detective Morel told him where GSR was found, Defendant said: "that's something new."

Detective Morel asked Defendant what he was forgetting, and he said that he had told her everything. His story was not changing. Detective Morel then discussed the ponds again, noting that the gun was not found. Detective Morel said that she needed Defendant to tell her something else because the gun had not been found. Defendant told her that the gun was in the pond. Defendant said if Roberts did not throw the gun in the pond, he probably brought it in his house. But, according to Defendant, Roberts threw the gun in the pond.

When asked if he carried the gun in the field for Roberts, Defendant laughed. Defendant said that he thought that Detective Morel was saying that Defendant carried the gun and shot Latiolais. Defendant said that it was hard to believe that GSR was found in his jacket and pants. He noted that no one had told him that before. Defendant said that he felt like they were trying to make it seem like he shot Latiolais. Defendant did not know why GSR was on his clothes instead of Roberts' clothes. He asked why GSR was not found on Roberts' clothes and said that something was not adding up.

Detective Morel asked why Roberts said that he had Defendant's back and would cover for him if Roberts was the shooter. Defendant said that Roberts told him to not to say anything because Roberts had Defendant's back. Defendant said that Roberts meant for Defendant not to tell them that that Roberts shot Latiolais because Roberts was going to get them a lawyer.

Defendant reported that he told ADA Cedars that Roberts shot Latiolais. ADA Cedars asked him to testify, but he did not show up because Roberts asked him not to.

Defendant again addressed GSR, stating that he did not know why GSR was on his clothes. He then said that Roberts wore the blue Nike jacket, which was the only explanation he could see. Detective Morel asked about the shorts and stated that Defendant was wearing jeans over them. Defendant made a face, and Detective Morel said "y'all" wear short pants under long pants. Defendant indicated that wearing jean shorts under jeans would be uncomfortable. Defendant reiterated that he never held that gun even when Roberts first bought it.

Detective Morel said that Defendant slipped and said that he shot Latiolais. Defendant told Morel that she was taking it the wrong way. He said that he did not shoot Latiolais and that it was something that slipped at that moment. He did not

mean to say that. He again denied shooting Latiolais. Defendant stated that he must have lied about the clothes and that Roberts probably had that on. Defendant said that he probably thought wrong when he said that he was wearing the Nike jacket. Detective Morel asked if he remembered wearing a gray sweatshirt, and Defendant asked her if he had that on. Defendant then said that it was not "that cold for all that." Detective Morel asked who was wearing what. Defendant said that he probably lied about what he wore. She asked about a blue hooded athletic works sweatshirt. Defendant asked if he was wearing that and said that he did not see that.

Detective Morel and Defendant discussed the gun again. Defendant said that the first time he saw the gun, he thought it was in Roberts' sleeve. It was pretty lit up in the field. He was sure he saw the gun. Roberts' left arm came up. He was asked how Roberts hid the gun. Detective Morel continued to tell Defendant that he said that Defendant was wearing the blue jacket. Defendant said that he must have lied about what he was wearing that night. Defendant then said that the offense was so long ago, how was he supposed to remember exactly. He told Detective Morel that him having pants and jeans on was news to him and that he did not remember saying that he had a blue Nike jacket on.

Defendant told Detective Morel that she messed his head up by saying that there was GSR on him. Defendant then said that Roberts probably had Defendant's clothes on that night. At the end of the interview, Defendant was upset that Roberts did not admit that he shot Latiolais.

Toby Latiolais was the evidence custodian for the St. Martin Parish Sheriff's Office for ten and one-half years. Toby testified that the St. Martin Parish Sheriff's Office was presented with two boxes of evidence on October 18, 2011. It was noted that the boxes were from "court continuation case." Toby explained that

51

"court continuation" meant that the sheriff's department was holding the evidence "until court is ready for it for the next phase of the trial." The evidence log did not indicate when the evidence had been checked out from the custodian, and the evidence custodian did not know where the evidence was or when the evidence was checked out. The boxes were sealed when returned, so the log did not indicate what condition the evidence was in. However, each time Toby opened the boxes, the evidence inside was packaged and sealed. It was noted that the evidence from Defendant's trial was not documented as removed from the evidence locker.

In brief to this court, Defendant contends that circumstantial evidence failed to exclude the reasonable theory that Roberts, not Defendant, murdered Latiolais. Defendant notes that eyewitness testimony, although inconsistent, identified Roberts as the shooter. Defendant contends that although GSR was found on clothing possibly worn by Defendant, that evidence failed to exclude the reasonable hypothesis that Defendant was not the person who shot Latiolais. First, Defendant notes that GSR was found on clothing associated with both him and Roberts; therefore, scientific evidence failed to exclude the reasonable hypothesis, supported by eyewitness trial testimony, that Roberts shot Latiolais. Second, Defendant asserts that testing could not establish whether the GSR was placed on clothing associated with Defendant when Latiolais was shot and could not exclude the reasonable hypothesis that GSR was placed on clothing associated with him before Latiolais was shot or when the clothing was in the ACL, which was not a GSR free lab. Third, Defendant argues that testing could not establish whether the GSR was placed on the clothing at issue while Defendant was wearing the clothing as DNA evidence established that someone other than Defendant had worn the clothing. Defendant points out that the presence of foreign DNA establishes the

52

reasonable hypothesis that someone other than Defendant wore the clothing when GSR was placed on it or that the clothing was not properly handled at ACL.

The State alternatively argued that Defendant that was a principal to Roberts' murder of Latiolais during the commission or attempted commission of a robbery. Defendant asserts that there was no indication that he knew Roberts intended to rob Latiolais during a drug deal. Defendant notes that there was some testimony that Latiolais' pockets were searched after he was shot but that there was no evidence that money was taken or that he knew that Roberts intended to take any money from Latiolais. Defendant further points out that eyewitness testimony indicated that he was not involved in the conversation between Roberts and Latiolais that occurred before Latiolais was shot. Defendant contends that because the State failed to negate the reasonable hypothesis that he did not shoot Latiolais and that he was not involved in a failed drug deal between Roberts and Latiolais, the State failed to exclude the reasonable hypothesis that he did not murder Latiolais and that he was not a principal to any attempted robbery. Therefore, according to Defendant, the State failed to satisfy its burden of proof.

The State argues that the issue presented is the identity of the killer and contends that there was sufficient evidence for the jury to determine that Defendant was the one who pulled the trigger, including his statement that he did so. The State notes that Defendant placed himself in the field where the offense occurred and gave inconsistent statements. The State avers that the jury could draw inferences from lies. It then asserts that several witnesses denied having a conversation about disposing of the murder weapon and that testimony was impeached. [10] The State further avers that the jury could take Defendant's

---

[10]Jermaine did not recall having a conversation. Mary recalled a conversation about a weapon being displaced but did not testify about what the parties to the conversation said.

53

statements that he lied and conclude that he was involved in both the shooting and the armed robbery. The State argues that it was the jury's purview to determine what he was wearing on the night of the offense and could have chosen to believe that he was wearing the blue Nike jacket that bore GSR. The State further argues that it was also the jury's choice to decide whether the GSR and DNA implicated Defendant as the shooter. The State contends that the jury clearly credited the physical evidence indicating that Defendant was the shooter.

The State mentions its alternative theory that Defendant was a principal to Roberts' actions. The State argues that it was reasonable for the jury to conclude that Roberts and Defendant intended to rob Latiolais of the $50.00 he had to spend on crack. This was supported by the change of clothes given the weather and the need to conceal the gun in preparation for the robbery. The State contends that it would be reasonable for the jury to conclude that Defendant and Roberts lay in wait for Latiolais in the field to conduct the robbery. The State avers that it was not significant that Latiolais still had money on him after the robbery, as it was immaterial whether the planned robbery was accomplished.

In his reply brief, Defendant notes that the State's own witnesses, Mouton and Charles, disproved its case. Specifically, Mouton confirmed that Defendant was wearing a hooded jacket on the night in question. Charles saw Roberts shoot Latiolais. The State then used Patt to discredit Charles' testimony. Defendant next attacks the investigation done by Detective Morel, noting that she did not review information obtained by the St. Martin Parish Sheriff's Office. Last, Defendant addresses the blue Nike jacket. Defendant points out that both of the State's fact witnesses confirmed that he wore a hooded jacket and that the only person that ever claimed that Defendant wore the blue Nike jacket was Detective Morel. However, Detective Morel admitted that her statement was not based in fact.

54

Defendant argues that the blue hooded Nike jacket and GSR and DNA taken from that jacket have no bearing on the case. Without that evidence, all that remains is witness testimony, and the State's witness testified that Roberts shot Latiolais.

The record in this case is filled with inconsistent testimony. The only direct evidence against Defendant was in his statement to Detective Morel. Detective Morel testified that Defendant said that he shot Latiolais. As previously noted, in his interview, Defendant said that he shot Latiolais and then immediately said that he did not and laughed. Defendant then said that he saw Roberts shoot Latiolais. Detective Morel later asked Defendant why Defendant said that he shot Latiolais, and Defendant again denied shooting him. He stated that he did not mean to say he shot Latiolais, and that he did not shoot him. He told Detective Morel that the initial remark just came out and that he did not know why it did. He laughed and told Detective Morel that if he did shoot Latiolais, he would not tell her that he did.

There was eyewitness testimony from Charles that he saw Roberts shoot Latiolais, which clearly contradicts Defendant's statement to Detective Morel that Defendant shot Latiolais. However, Patt's testimony contradicts that of Charles in that Patt testified that Charles told him that Roberts did not shoot Latiolais. Testimony presented indicated that only Defendant, Roberts, and Charles were in the field with Latiolais when he was shot.

GSR testing on the blue Nike jacket and jean shorts was used in an attempt to prove that Defendant was the shooter. However, based on the evidence presented at trial, this court finds that there is reasonable doubt as to whether Defendant wore that clothing at the time of the offense. Officer Guidry testified that Mouton said that Defendant and Roberts initially wore white shirts and that one wore jeans and the other dark pants. The two entered Roberts' house and exited wearing dark colored clothing and hoods. In Mouton's 2002 statement,

which would have been more accurate than his trial testimony, he reported that Roberts wore black pants with a white t-shirt and that Defendant wore black "Jabot" jeans with a white t-shirt and a black hooded jacket but was not wearing the hood. Later, the two both had hoods on their heads. Charles testified that Roberts and Defendant were wearing hoods when they met up in the field, and his statement to police confirmed this. In Defendant's interview with Officer Guidry, Defendant said that he was wearing a white shirt, shorts, and slippers and that Roberts wore a big navy blue sweater with a yellow collar, jeans, and Nikes.

Mouton and Charles indicated that Defendant wore a hood when he was last seen by them. The blue Nike jacket did not have a hood. Detective Morel testified that Defendant said that he was wearing the blue Nike jacket during their first interview. That testimony proved to be false. During Detective Morel's second interview with Defendant, Detective Morel told him that he previously said that he was wearing the jacket that night. He may have initially agreed with Detective Morel's statement, but he later questioned whether he wore the jacket ten years prior. Defendant was also concerned when Detective Morel told him that GSR was found on the jacket, and he said that he must have lied when he previously told her that he was wearing it. Defendant then said that Roberts must have been wearing the jacket. DNA testing of that jacket indicated that someone other than Defendant wore the jacket, but it was not Roberts. Based on the evidence presented, the State never conclusively proved that Defendant was wearing the blue Nike jacket on the night Latiolais was shot. Defendant is the only person who said that he wore jean shorts that night, and the jean shorts submitted for GSR testing had one GSR particle which, per the lab report, had limited evidentiary value. GSR testing did not prove beyond a reasonable doubt that Defendant fired the gun because the lab that processed the blue Nike jacket and jean shorts twice

56

was not a GSR free facility. The testimony regarding contamination cannot be ignored.

There is internal contradiction in Defendant's statement to Detective Morel, and other testimony undermines his statement. This court finds that it was not rational for the jury to conclude that Defendant shot Latiolais and that it was not rational for the jury to conclude that the State negated all reasonable probability that Roberts was not the shooter. Thus, Defendant's conviction must be reversed.

If Roberts was the shooter, Defendant could be convicted as a principal to second degree murder committed during the commission of or attempted commission of an armed robbery if the State proved the elements of the offense beyond a reasonable doubt. According to Defendant and Charles, Roberts shot Latiolais. There was no direct evidence regarding a discussion, plan, or agreement to rob Latiolais. There was no testimony that there was a plan to meet Latiolais in the field that night, that Roberts or Defendant knew where Latiolais lived, that they knew Latiolais could walk through the field to get home, or where Latiolais was going when he left Mouton's house.

Williams testified that Latiolais' employer stated that he was paid a little over $200.00. However, there was no testimony regarding the date Latiolais was paid or his spending activity thereafter. Mouton told police that "the guys" knew that Latiolais had money on him. Despite stating that he did not speak to Roberts after the offense, in his April 3, 2002 statement to Boyd, Defendant said that Roberts shot Latiolais for $50.00 but that Roberts found nothing when he searched Latiolais, including an I.D. However, $51.69 was recovered during the autopsy, and the sheriff's department returned $160.49 to Latiolais' family.

Mouton indicated that Defendant and Roberts wore hoods, which were not suitable for the weather. However, Mouton's statement to police indicated that

Defendant initially had a hooded jacket on and merely put a hood on prior to heading to the field that night. There was no other testimony regarding weather conditions on the date at issue.

Defendant accompanied Roberts into the field where the offense occurred, and Roberts had a gun when he shot Latiolais. Defendant denied knowing that Roberts had the gun. Mouton testified that Defendant and Roberts had their hands in their pockets when they passed his residence on the way to the field. Additionally, Charles did not see a gun prior to Latiolais being shot.

After Latiolais was shot, Defendant ran with Roberts when Roberts threw the gun into a pond, failed to assist Latiolais, and did not initially report the offense to police when it occurred.

A rational trier of fact, viewing the evidence in the light most favorable to the State, could only speculate as to whether there was an armed robbery, an attempted armed robbery, or something else, because the State's evidence, even viewed in a pro-prosecution light, did not exclude beyond a reasonable doubt that this killing was not an armed robbery or attempted armed robbery.

In *State v. Higgins*, 03-1980 (La. 4/1/05), 898 So.2d 1219, *cert. denied*, 546 U.S. 883, 126 S.Ct. 182 (2005), the defendant was convicted by a jury of first degree murder and sentenced to death for the killing of Donald Price during an attempted armed robbery. The supreme court reduced the conviction to second degree murder based upon the evidence, overturning the first degree murder conviction on grounds that the evidence was insufficient to show the element of specific intent in order to prove that the defendant was engaged in an armed robbery or attempted armed robbery during the murder. The state's only eyewitness to the alleged armed robbery and killing was Wanda Brown, who informed police seventeen months after Price was killed that she had witnessed the

58

crime. She claimed to be only five or six feet away from the defendant and Price when the defendant shot Price in the head at close range. However, Brown testified that she could not hear what the defendant and Price were saying to each other and that she did not see the defendant take anything or attempt to take anything of value from the victim. Although she did not hear what they were saying, she testified that Price and the defendant were arguing, and she concluded by the movements of their hands that it was "like if a robbery was taking place." *Id.* at 1228. She later admitted on the stand that she had testified that it was an armed robbery because she had read and heard in the newspapers and other media that Price was murdered while the defendant attempted to steal his Ford Explorer. She demonstrated the hand gestures to the court and stated that she did not get that from the media. *Id*.

The supreme court addressed the sufficiency of the evidence as follows:

Given the above evidence, a rational juror could not have concluded beyond a reasonable doubt that the defendant was guilty of every essential element of the crime of armed robbery because the state had not proven, from direct or circumstantial evidence, that the defendant had taken "anything of value" from the victim to constitute the crime alleged. *See State v. Captville*, 448 So.2d 676 (La.1984). In fact, the state concedes in its brief to this court that Brown's testimony is insufficient to prove a completed armed robbery. *See* Rep. Br. at 20. Instead, the state argues Brown's testimony is sufficient to support a reasonable juror's conclusion that the killing took place during an attempted armed robbery, thereby supporting his conviction on charges of first degree murder. However, to support a conviction of attempted armed robbery, the state must prove the defendant, having the specific intent to commit the armed robbery, did or omitted "an act for the purpose of and tending directly toward the accomplishing of his object." *See* La. R.S. 14:27.

The state's conviction rests on the testimony of Wanda Brown, and a detailed examination of her testimony, in conjunction with the physical evidence, reveals that no rational juror could have found beyond a reasonable doubt that the killing took place during an attempted armed robbery. Brown's testimony regarding the attempted armed robbery is based mostly on her interpretation of the events she witnessed. However, her interpretation of the events is subject to several factors which reduce the reasonableness of her conclusions

59

and perceptions, namely, the time between the event and her initial statement to police, the influence of local media coverage, and the intoxicated state she was in at the time of her observations.

In fact, some discrepancies exist in Brown's own testimony regarding why she thought the perpetrator was attempting to rob the victim at the time of the shooting. Early in her testimony, she attributed her belief that the killing took place during an attempted armed robbery to "the media, the newspaper, [and] hearsay" that "Shawn Higgins was trying to rob Donald Price of his Ford Explorer" at the time of the murder. However, during the state's cross-examination, Brown attempted to act out the encounter and demonstrate why she believed an attempted armed robbery was taking place. During this demonstration, Brown testified her belief that this was an attempted armed robbery was based upon what she witnessed, primarily the "hand gestures" during the confrontation between the Price and the gunman, and not upon the media coverage.

Consistent, however, with the physical evidence was Brown's testimony that she never saw the gunman try to take anything from the victim nor saw the gunman try to grab anything from the victim. To this extent, her account corresponds with Deputy Moscona's testimony that the victim's belongings, including his wallet and its contents, were found on or under the victim when he died. Accordingly, for all that appears, Brown had little if any factual basis for her belief that the killing took place during the course of an attempted armed robbery aside from that discerned from the post-killing media coverage.

This case is factually similar to *State v. Bright*, 98–0398 (La. 4/11/00), 776 So.2d 1134, in which this court held that the evidence presented at trial constituted a second degree rather than a first degree murder. In *Bright*, the victim had just collected his winnings from a bar's Super Bowl pool and was returning to his vehicle when he was confronted by two men. *Id.* at p. 4, 776 So.2d at 1138. The victim's friend heard the victim say "what?", followed by an unintelligible word by the gunman to which the victim responded "[w]hat's up with that?" *Id.* The gunman then shot the victim who ran towards the rear of his vehicle and stumbled back into the bar and later died. *Id.* Both the gunman and his accomplice immediately fled in the opposite direction. *Id.* When emergency personnel responded to the scene, they could not locate one of the two envelopes containing $500 of the victim's football pool winnings. *Id.* at p. 6, 776 So.2d at 1139.

The state argued in *Bright* that the assailants shot and killed the victim in an attempt to take his football pool winnings. *Id.* at p. 11, 776 So.2d at 1141. However, this court held that the above scenario constituted a second degree rather than a first degree murder. *Id.* at p. 14–15, 776 So.2d at 1143. Specifically, this court found no evidence that the defendant in that case knew of the victim's winnings, no evidence that the assailants made a demand for the victim's winnings

or anything else of value, no evidence that the victim attempted to resist or flee, no evidence that the assailants attempted to pursue or reach for the wounded victim, and insufficient evidence to distinguish the killing from one "animated by personal grudge or vendetta." *Id.* at p. 12–14, 776 So.2d at 1142–43. This court concluded that the evidence introduced by the State necessitated the jurors "to speculate" as to the motivation of the attack on the victim; thus the conviction for first degree murder could not sufficiently stand on the evidence presented at trial because " 'the jury cannot be permitted to speculate if the evidence is such that reasonable jurors must have a reasonable doubt.' " *Id.* at 15, 776 So.2d at 1143 (quoting [*State v.*] *Mussall*, 523 So.2d 1305, 1311 [(La.1988)]).

In the instant case, the state points to Brown's testimony that a heated discussion took place before the killing in an attempt to distinguish *Bright*. However, while it appears that the length of the interaction in the instant case may have been longer than that of the three or four sentences exchanged in *Bright*, during her testimony Brown never explicitly stated how long the confrontation between the victim and gunman lasted. Therefore, although the state attempts to characterize the discussion in the instant case as the victim's attempt to resist the armed robbery, such a characterization appears to be mere conjecture since Brown could not hear the words or tone of the exchange. Thus, Brown's testimony, even without considering her alcohol consumption on the night in question, is not sufficient to constitute proof beyond a reasonable doubt with regards to the charge of attempted armed robbery, especially in light of the ambivalent and equivocal nature of her testimony regarding her observations and interpretation of the confrontation she witnessed that night.

Further, like in *Bright*, the state in the instant case presented no evidence that the gunman attempted to pursue or reach for the wounded victim, and presented insufficient evidence to distinguish the killing from one animated by personal grudge or vendetta. In fact, the victim in the instant case, unlike the victim in *Bright*, appeared to have all of his possessions intact when police arrived. Accordingly, as in *Bright*, the state presented insufficient evidence of an attempted armed robbery.

. . . .

Thus, while the defendant contests both of the above credibility determinations of the jury, for the reasons set out above, one such determination was rational and one was not. The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the fact finder's discretion "only to the extent necessary to guarantee the fundamental protection of due process of law." *Mussall*, 523 So.2d at 1310. The due process standard of review under *Jackson* [*v. Virginia*], 443 U.S. [307] at 319, 99 S.Ct. [2781]at 2789 [(1979)], does not sanction juror speculation if the evidence is

such that a reasonable factfinder must have a reasonable doubt. *State v. Lubrano*, 563 So.2d 847, 850 (La.1990).

> In this case a rational trier, viewing the evidence in the light most favorable to the state, could only speculate whether there was an attempted armed robbery at the time of the shooting. The evidence at trial, therefore, failed to establish every element of the charged offense and cannot support defendant's conviction for first degree murder.

*Id.* at 1229–32 (first and second alterations in original).

The evidence in this case was also insufficient to prove that Defendant knowingly participated in the planning or execution of an offense. "Knowledge that a crime will be, or has been committed, is insufficient by itself." *State v. Cayton*, 98-100, p. 4 (La.App. 3 Cir. 10/28/98), 721 So.2d 542, 544. However, it is sufficient that the accomplice is standing by at the scene of the crime ready to give some aid if needed. *Petty*, 103 So.3d at 616. There was no direct evidence that Defendant and Roberts discussed, planned, or agreed to rob Latiolais or that Defendant was standing by ready to give aid. "A trial jury's inference that an accused aided and abetted in a crime cannot be 'mere speculation based upon guilt by association.'" *State v. Schwander*, 345 So.2d 1173, 1175 (La.1977) (citing *State v. Williams*, 310 So.2d 513 (La.1975)). For these reasons, this court finds that Defendant cannot be a principal to any responsive verdict to second degree murder.[11]

## GUNSHOT PRIMER RESIDUE (GSR) TESTING

---

[11]Louisiana Code of Criminal Procedure Article 821(E) provides:

> If the appellate court finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense, the court, in lieu of granting a post verdict judgment of acquittal, may modify the verdict and render a judgment of conviction on the lesser included responsive offense.

The applicable responsive verdicts are guilty of manslaughter, guilty of negligent homicide, and not guilty. La.Code Crim.P. art. 814(3).

In his second assignment of error, Defendant contends that the trial court abused its discretion when it denied his motion in limine to exclude evidence of gunshot primer residue testing that improperly suggested to the jury that he shot Latiolais. Defendant alleges that such testing could not establish whether gunshot primer residue was placed on clothing associated with him before Latiolais was shot, when Latiolais was shot, or after Latiolais was shot when the clothing was in the ACL, which was not gunshot residue free. Further, Defendant alleged that such testing could establish who was wearing the clothing when the gunshot primer residue was placed on it. Because we have determined that Defendant's conviction should be reversed, this assignment of error is moot.

## V.

## CONCLUSION

We find that assignment of error number one has merit and that the evidence presented by the State was insufficient to support the conviction of Marshall J. Alexander, Jr., for second degree murder, a violation of La.R.S. 14:30.1. Therefore, the conviction is reversed, and the corresponding sentence of life imprisonment at hard labor without benefits is vacated and set aside.

**CONVICTION REVERSED AND
SENTENCE VACATED.**

# STATE OF LOUISIANA

## COURT OF APPEAL, THIRD CIRCUIT

### 21-641

STATE OF LOUISIANA

VERSUS

MARSHALL J. ALEXANDER, JR.


**Pickett, J., dissents and assigns reasons.**

I respectfully dissent. The law that governs appellate review in criminal cases wherein the defendant argues there was insufficient evidence to convict is clear and well-established.

> An appellate court reviewing a claim of insufficient evidence must determine that the trial evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Jacobs,* 504 So.2d 817 (La.1987). The elements must be sufficient that every reasonable hypothesis of innocence is excluded. LSA–R.S. 15:438 . . . . If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be upheld. *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988). However, if the appellate court finds that no rational trier of fact, viewing all the evidence from a pro-prosecution standpoint, could have found guilt beyond a reasonable doubt, the conviction cannot constitutionally stand. *Id.*

*State v. Hawkins*, 96-0766 (La. 1/14/97), 688 So. 2d 473, 479

I respectfully submit that the majority has misapplied this standard and has, in fact, substituted its credibility determinations and the weight given to certain evidence for that of the jury's findings, which is clearly prohibited on appellate review.

This case involves evidence that is both direct and circumstantial. The majority correctly notes that much of the testimony presented to the jury was inconsistent and contradictory. It is common for testimony to be inconsistent and contradictory. A jury trial which did not have contradictory testimony would be a rarity. In the matter before us, most of the witnesses to the events that transpired in the area of the homicide are, in fact, relatives of the individuals who stand accused of the crime. It is hardy shocking that some of these witnesses would deny making statements to law enforcement which they later realize have implicated a relative in the crime.

The jury is tasked with the duty of making credibility determinations. The jury had the opportunity to view the witnesses as they testified and note their demeanor, tone of voice, and all those elements that should be considered in determining whether the testimony is believable and what weight should be afforded a witnesses testimony.

The jury further determines what weight to give to the physical evidence presented. Testimony was presented by crime lab experts pertaining to the gunshot residue (GSR) found on the items seized from the defendant's house and the house of his alleged partner. The jury had the opportunity to hear that testimony. This included testimony that when a crime lab is not 'GSR free,' it does not automatically mean that the evidence being examined was contaminated. They listened to the testimony as to the methodology used to examine the evidence. They heard the expert findings that the majority of the GSR retrieved was on clothing owned by and seized from the defendant. The jury heard how the defendant attempted to explain how it was possible to find GSR on his clothing when he had, in fact, denied any contact with a firearm.

In addition, the jury had the opportunity to review the taped statements given by the defendant to law enforcement. This included a statement wherein he admitted to shooting the victim. He immediately recanted that statement and said that he was not the shooter. The jury, however, had the right and duty to determine what, if any, weight to place on a statement of admission. Further, the defendant's other statements continually shifted to try to explain away physical evidence, such as the presence of GSR on his clothing and statements from other individuals. The jury had those statement before them as well.

Having reviewed the transcript, and all evidence presented, in its entirety, I find that when viewing the evidence in a light most favorable to the prosecution, as is mandated by *Jackson*, there is sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that the defendant is guilty of the offense charged. Further, there is sufficient evidence for the jury to find that every reasonable hypothesis of innocence has been excluded.

I respectfully submit that the majority can only reach its conclusions by substituting its credibility determinations and by substituting its opinion as to the weight of the physical evidence, for those made by the jury. This is impermissible on appellate review and reflects an improper application of *Jackson* in this matter.

I respectfully dissent find there is sufficient evidence to sustain the conviction and would consider the remaining Assignment of Error.

3